## STUART *v.* HAYDEN.

## GRUETTER *v.* STUART.

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH
CIRCUIT.

Nos. 151, 160.  Argued December 9, 10, 1897. — Decided January 10, 1898.

One who holds shares of national bank stock — the bank being at the time
insolvent — cannot escape the individual liability imposed by the statute
by transferring his stock with intent to avoid that liability, knowing or
having reason to believe, at the time of the transfer on the books of the
bank, that it is insolvent or about to fail.

A transfer with such intent and under such circumstances, is a fraud upon
the creditors of the bank, and may be treated by the receiver as inopera-
tive between the transferrer and himself, and the former held liable as
a shareholder without reference to the financial condition of the trans-
feree.

The right of creditors of a national bank to look to the individual liability
of shareholders, to the extent indicated by the statute, for its contracts,
debts and engagements, attaches when the bank becomes insolvent; and
the shareholder cannot, by transferring his stock, compel creditors to
surrender this security as to him, and force the receiver and creditors
to look to the person to whom his stock has been transferred.

If the bank be solvent at the time of the transfer, that is, able to meet its
existing contracts, debts and engagements, the motive with which the

1

transfer is made is immaterial, as a transfer under such circumstances does not impair the security given to creditors; but if the bank be insolvent, the receiver may, without suing the transferee and litigating the question of his liability, look to every shareholder who, knowing or having reason to know, at the time, that the bank was insolvent, got rid of his stock in order to escape the individual liability to which the statute subjected him.

Whether, the bank being in fact insolvent, the transferrer is liable to be treated as a shareholder in respect of its existing contracts, debts and engagements, if he believed in good faith, at the time of the transfer, that the bank was solvent — not decided; although he may be so treated, even when acting in good faith, if the transfer is to one who is financially irresponsible.

Where the Circuit Court and the Circuit Court of Appeals agree as to what facts are established by the evidence, this court will not take a different view, unless it clearly appears that the facts are otherwise.

THE case is stated in the opinion.

*Mr. C. C. Flansburg* for Stuart.

*Mr. G. M. Lambertson* for Hayden. *Mr. Amasa Cobb, Mr. A. E. Harvey* and *Mr. F. M. Hall* were on his brief.

*Mr. John H. Ames* for Gruetter.

MR. JUSTICE HARLAN delivered the opinion of the court.

On the 6th day of February, 1893, the Comptroller of the Currency appointed a receiver of the Capital National Bank of Lincoln, Nebraska, which had a nominal capital of three hundred thousand dollars. The bank had shortly before suspended business, and upon due examination had been found to be insolvent.

Subsequently, June 10, 1893, that officer — having first determined that in order to pay the debts of the bank it was necessary to enforce the individual liability of shareholders as prescribed in sections 5151 and 5234 of the Revised Statutes — made an assessment for three hundred thousand dollars, to be paid by shareholders equally and ratably on or before July 10, 1893. Of this assessment and requisition Stuart had proper notice.

In execution of this order the receiver brought the present action against Stuart.

Stuart became the owner of one hundred shares of the stock of the Capital National Bank in 1884, and of fifty additional shares in 1886. Substantially from the time of becoming a shareholder he was one of the directors of the bank, and a member of its finance committee, and acted in both capacities until about December 16, 1892. On the last named day, Gruetter & Joers, dealers in furniture at Lincoln, sold to Stuart certain real property in that city for $67,500, upon which there was at the time a mortgage for $30,000 bearing interest at the rate of six per cent per annum. The terms of the contract were that Stuart should assume the mortgage debt, deliver to Gruetter & Joers his stock in the Capital National Bank as of the value of $18,000, meet the taxes on the property, which then amounted to $250, and pay the balance of the price in cash; Gruetter & Joers to take a lease of the real estate for ten years, at $6000 per year. At the time of this agreement, Stuart paid $1000 to bind the bargain. On the 22d day of December, 1892, Gruetter & Joers made their deed to Stuart for the real estate; and Stuart delivered to them his certificates of shares of stock, having signed the blank forms of powers of attorney endorsed thereon, and paid the balance of the agreed price in cash, the taxes on the property and the interest that had accrued on the mortgage.

On the 3d day of January, 1893, the certificates of stock, with the blank powers of attorney endorsed thereon, were returned to the bank, and new certificates were issued to Gruetter & Joers.

The bank closed its doors within less than three weeks after the stock was transferred on its books to Gruetter & Joers, its total assets being about $900,000, and total liabilities $1,463,013.17. Its bills receivable on hand were $519,600, of which $58,596.82 were good, $141,393.27 were doubtful, and $319,611.90 were worthless. Its bills receivable not on hand amounted to $141,000, of which only $10,000 were worth anything.

The original bill was against Stuart alone. But a demurrer for want of parties having been sustained, an amended bill was filed against Stuart, Gruetter and Joers.

The amended bill alleged in substance that, at the time of the transaction between Stuart and Gruetter & Joers, the former was fully advised of the failing condition and insolvency of the bank, and transferred his stock to them in anticipation of its early failure and the necessary enforcement of the liability of shareholders for the benefit of creditors, and with the intent to evade such liability and to defraud the creditors of the bank. The relief sought was a decree setting aside the transfers of stock, and adjudging that Stuart was liable as a shareholder of the bank under the assessment made by the Comptroller of the Currency. It was further alleged by the receiver that Gruetter & Joers were, at the time of the transfer to them of Stuart's stock, pecuniarily irresponsible persons, from whom the amount of such assessment upon each share of the stock so owned and held by Stuart could not be made by legal process or otherwise.

Stuart in his answer insisted that the sale to Gruetter & Joers was an ordinary business transaction, and denied that he had, at the time of his purchase from Gruetter & Joers, any knowledge whatever of the condition of the bank, or that he knew that the bank was then insolvent, or that he expected it to fail; that, on the contrary, he believed it to be perfectly solvent, and sold and transferred his stock without any thought of the enforcement of his liability as a shareholder, and without any intention to evade such liability or to defraud the bank's creditors.

Gruetter & Joers answered, and averred that Stuart made the transfer of stock to them with full knowledge of the failing condition and insolvency of the bank, in anticipation of its approaching suspension and with the intent to defraud the bank, its depositors and creditors, of the security afforded by law to such depositors and creditors, and render it impossible to enforce his liability as a shareholder; also, that Stuart, with the knowledge and intent stated, represented and warranted to them that the bank was in a safe and solvent

condition, and that its stock was reasonably worth $125 per share, or $18,000 in all. They also filed a cross-bill against the receiver and Stuart, in which the relief sought was a decree declaring the transfer of the stock standing in the name of Stuart to be fraudulent and void as against them, as well as against the receiver and the creditors of the bank, and adjudging that Stuart make full restitution to them of the amount at which such stock was received on the contract for the purchase of the real property sold and conveyed to him.

The decree in the Circuit Court recited — though not in the form of a finding of facts — that on and prior to January 3, 1893, Stuart was the owner of and had standing in his name upon the books of the bank the shares of stock above mentioned; that on or about December 16, 1892, and for more than eight years prior to that date, he was a member of the Board of Directors and of the finance committee of the bank; that on both of the above dates he had knowledge of its then existing insolvency; that at the time of the transfer of the stock he represented to Gruetter & Joers that the bank was in a solvent and prosperous condition, and that such representation was made for the purpose of inducing them to purchase the stock, and of evading and escaping his liability as a shareholder for an assessment thereon. It was then ordered, adjudged and decreed that the sale, assignment and transfer of the one hundred and fifty shares of stock of the Capital National Bank was wholly void as against the receiver and Gruetter & Joers; that the sale, assignment and transfer be set aside, cancelled and held for naught; that the stock be reinstated upon the books of the bank in the name of Stuart, who was declared to be the holder and owner thereof; that Stuart, within twenty days from the date of the decree, pay to the receiver the full amount of the assessment against the stock, and that the receiver recover from him the sum of fifteen thousand dollars, together with interest at the rate of seven per cent per annum, from the 10th day of July, 1893, being in the aggregate the sum of sixteen thousand eight hundred seventy-five and $\frac{42}{100}$ dollars; that Stuart,

within twenty days from the date of the decree, make full restitution and payment to Gruetter & Joers of the amount of the purchase price of the stock, to wit, the sum of eighteen thousand dollars, together with interest thereon at the rate of seven per cent per annum, from the third day of January, 1893, being in the aggregate the sum of twenty thousand nine hundred and five dollars; that Gruetter & Joers be relieved from all liability to the receiver for and on account of any assessment on the stock, and in case Stuart neglected to pay each of the aforesaid sums of money, together with the costs of the suit, to be taxed by the clerk, that execution should issue therefor.

Upon appeal to the Circuit Court of Appeals the decree was reversed, without costs to either party, and the cause was remanded with instructions to enter a decree declaring the transfer of stock from Stuart to Gruetter & Joers to be fraudulent and voidable as to the receiver of the bank; that the receiver recover of Stuart the assessment made upon him, with costs; and that Gruetter & Joers were not entitled to relief against Stuart in this suit, and their cross-bill should be dismissed with costs to Stuart. 36 U. S. App. 462. In the opinion of that court it is stated that the evidence justified the conclusion reached by the Circuit Court as to the facts.

From the decree of the Circuit Court of Appeals the present appeals have been prosecuted.

The shares of the capital stock of a national bank are transferable on its books in such manner as may be prescribed by the by-laws or articles of the association, and every one becoming a shareholder by such transfer succeeds, in proportion to his shares, to all the rights and liabilities of the prior holder. Rev. Stat. § 5139.

It is also provided by statute that "the shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares." Rev. Stat. § 5151.

The principal inquiry in this case is whether Stuart transferred his stock to Gruetter & Joers in order to escape the liability imposed by statute upon shareholders of national banking associations. His contention is that if the transfer was absolute and to persons who were at the time solvent and able to respond to an assessment upon the shares, the motive with which the transfer was made is of no consequence.

This construction of the statute seems to find some support in the general language used in a few cases. But it will be found upon examination that those cases were dealt with upon the basis that the facts therein showed not only an intent upon the part of the shareholder to escape liability by transferring his stock, but that the transfer was either colorable or to a person who was financially irresponsible at the time of such transfer. There is no case in which this court has held that the intent with which the shareholder got rid of his stock was of no consequence; certainly, no case in which the intent was held to be immaterial, when coupled with knowledge or reasonable belief upon the part of the transferrer that the bank was insolvent or in a failing condition.

In *National Bank* v. *Case*, 99 U. S. 628, 631, 632, this court, speaking by Mr. Justice Strong, said that while a shareholder of the stock of a corporation has, generally, a right to transfer his shares, and thereby disconnect himself from the corporation, and from responsibility on account of it, there were limits to that right; that it is not every transfer that releases a stockholder from his responsibility as such; and that " a transfer for the mere purpose of avoiding his liability to the company or its creditors is fraudulent and void, and he remains still liable." And in *Pauly* v. *State Loan and Trust Company*, 165 U. S. 606, 619, where the previous cases in this court were reviewed, it was held to have been established that " if the real owner of the shares [of a national banking association] transfers them to another person, or causes them to be placed on the books of the association in the name of another person, with the intent simply to evade the responsibility imposed by section 5151 on shareholders of national banking

associations, such owner may be treated, for the purposes of that section, as a shareholder, and liable as therein prescribed."

The safety of a national banking association, so far as its creditors are concerned, depends largely upon the security given by the statutory provision entitling creditors to look to the individual liability of shareholders, including the liability of the estates and funds in the hands of executors, guardians and trustees holding shares of national bank stock. § 5152. One who holds such shares — the bank being at the time insolvent — cannot escape the individual liability imposed by the statute by transferring his stock with intent simply to avoid that liability, knowing or having reason to believe, at the time of the transfer on the books of the bank, *Richmond* v. *Irons*, 121 U. S. 27, 58, that it is insolvent or about to fail. A transfer with such intent and under such circumstances, is a fraud upon the creditors of the bank, and may be treated by the receiver as inoperative between the transferrer and himself, and the former held liable as a shareholder without reference to the financial condition of the transferee. The right of creditors of a national bank to look to the individual liability of shareholders, to the extent indicated by the statute, for its contracts, debts and engagements, attaches when the bank becomes insolvent, and the shareholder cannot, by transferring his stock, require creditors to surrender this security as to him, and compel the receiver and creditors to look to the person to whom his stock has been transferred. This court has said that "the individual liability of the stockholders is an essential element in the contract by which the stockholders became members of the corporation. It is voluntarily entered into by subscribing for and accepting shares of stock. Its obligation becomes a part of every contract, debt and engagement of the bank itself, as much so as if they were made directly by the stockholder instead of by the corporation. There is nothing in the statute to indicate that the obligation arising upon these undertakings and promises should not have the same force and effect, and be as binding in all respects, as any other contracts of the individual stockholders." *Richmond* v. *Irons*, 121 U. S. 27, 55, 56. If the bank be sol-

vent at the time of the transfer, that is, able to meet its existing contracts, debts and engagements, the motive with which the transfer is made is, of course, immaterial. But if the bank be insolvent, the receiver may, at least, without suing the transferee and litigating the question of his liability, look to those shareholders who, knowing or having reason to know, at the time, that the bank was insolvent, got rid of their stock in order to escape the individual liability to which the statute subjected them. Whether — the bank being in fact insolvent — the transferrer is liable to be treated as a shareholder, in respect of its existing contracts, debts and engagements if he believed in good faith, at the time of transfer, that the bank was solvent, is a question which, in the view we take of the present case, need not be discussed; although he may be so treated, even when acting in good faith, if the transfer is to one who is financially irresponsible.

The intent with which an act was done may be proved by the declarations of the party concerned, or by facts and circumstances from which the existence of the intent may be reasonably inferred.

Stuart, both in his answer and as a witness in his own behalf, denies that the sale of his stock was with the view of escaping his liability as a shareholder. He states, also, that it was an ordinary business transaction, and so far from knowing at the time that the bank was insolvent, he believed it to be solvent and able to meet its liabilities of every kind.

But the contention of the receiver was sustained by the proof in the cause. It was in evidence that Stuart, for some time previous to the sale of his stock, had been dissatisfied with the conduct of Mosher, the president of the bank. In addition to the latter's duties as president he was in enterprises that required much attention, and which must have interfered with the proper supervision of the affairs of the bank. He was connected with a manufacturing company, an insurance company and a gas company; was interested in a company engaged in the making of staves in Arkansas; was in the skating rink business, and also in the baseball business. In addition, he had a penitentiary con-

tract, and was a legislative lobbyist. All this was well known to Stuart when he sold his stock to Gruetter & Joers. Before that transaction, he had received an "intimation" that the next general dividend would be passed. He also had information that a large amount of the bank's money was "locked up" in real estate, and invested in worthless securities. And he was in a position to ascertain, with at least reasonable certainty, the condition of the bank at or before the sale of his stock to Gruetter & Joers. As a director he signed each of the reports made to the Comptroller of the Currency of the condition of the bank at the close of business on September 25, 1891, December 2, 1891, March 1, 1892, May 17, 1892, and September 30, 1892. He did not sign the report of December 9, 1892. In addition, his membership of the finance committee of the bank gave him peculiar facilities to ascertain how the bank's money was being used by its president. And that he had information that made him somewhat uneasy about the condition of the bank, and its management by Mosher, is shown by his own testimony as well as by his declarations to witnesses, whose intelligence and truthfulness are not impeached by anything in the record, except the denial by Stuart that he said just what those witnesses testified that he did say. Nor is this negatived by the circumstance that Stuart and his wife had each $1250 on deposit in the bank at the time its doors were closed. That may be accounted for by the fact, admitted by him, that he did not expect the bank to fail so soon.

When the bank failed, Mrs. King, the wife of Dr. S. H. King, had $26,105.80 on deposit there. The first intimation she received of the failure was a statement in a morning paper that the bank had closed its doors. She hurried to the residence of Stuart to ascertain what was the matter with the bank. Her account of the interview with him was as follows: "I told him the Doctor had sent me there for him to tell me about the bank, what the condition had been, and if there was anything wrong, and he sat down, and in his good, quiet way told me he did not like the way the bank had been doing for a long time. He said he did not like their going into the

Opinion of the Court.

Western Manufacturing Company business, and he said he had a talk with Mr. Mosher about it, and he said he did not like the Arkansas business, and I asked him what that was, and he said it was a stave business, and he said he did not know of any loss of money in it, but he did not like it, and he said from that they went into the skating rink business, and he said then he felt mad, and he said this is not banking, and I told them so, and then he said, when they went into the baseball business, I said it must be stopped; that we must stop that and do a banking business, and not run after these outside affairs, and, as near as I can give it, he said they were mad, but he told them if they did not stop that kind of business he would get out. Q. Who do you mean by them? A. Mosher and Outcalt [the cashier]; and he said one of them swore very badly and used bad language, and he said particularly Mosher, and at this time I said that the Doctor has gone to see Mosher about it, and he said if he has not gone you tell him to go to Outcalt, because he can get the truth out of Outcalt better than Mosher. And I said, Professor, [Stuart] what is the condition of the bank? Why is it closed? He says I have known for quite a while they had some bad debts, such as very poor paper there, amounting to about $136,000, and he says, I did not like the way they were doing. They could not do outside business and that too, and I did not like it. And, of course, anybody who knows Professor Stuart knows that would not be the way of his doing business, and he said he was in hopes they would tide it over, and he said they had some very poor paper, and he spoke of some land in a different county, and at that Mrs. Stuart came in, and he says, you know I have sold out — which I had not known — and he said, well, he had traded his stock for the Gruetter building a short time before. At this juncture Mrs. Stuart came into the room, and she says, 'It don't let you out from being responsible, does it? How long has it been?' Oh, no, he says, and then he spoke about the board of directors."

Being asked to state any further conversation she had with Stuart the same morning in reference to the bank and its condition, the witness proceeded: "He went on and told me

about it, he said he had not liked the management of the bank, and felt anxious about it, and I asked him how long, and he said a long time; and he went on and repeated again what he said before about going off into side business and said he did not like their not being able to declare a dividend, and I asked him this question. I asked him why the bank was not closed in the condition it was, and asked him if he did not know that the bank's capital was impaired, and he said that it was; still he did not know he said about having the bank closed. And I asked if the bank had been closed we could have gotten something out of the bank, and he said he was in hopes they could tide it over, and Mrs. Stuart says, Professor, you did not expect this so soon."

Henry Gerner, a witness for the plaintiff, and a stockholder in the bank, stated that he had a conversation with Stuart before the failure of the bank as to the sale of his stock to Gruetter & Joers. Being asked to state that conversation, he said:

"Well, one afternoon I met the Professor, which was an almost daily occurrence, if I did not see him in the bank I met him on the street, and we passed the compliments of the day and some remarks, and one day in one of our conversations and talks he told me that he was contemplating making a real estate deal. I said 'yes,' 'yes' he says he had a proposition made him to purchase the Gruetter block down here, and it was a trade, and he said if he made the trade at all, it would be trading his bank stock and some money and assuming their liabilities, their obligations, a mortgage on the building for $30,000. I told him I thought it was rather an exorbitant price for the property; that I did not consider the building worth any such money, to which he responded that they were going to make a very good lease; they would take it for ten years — a ten years' lease on the premises at a rental of $6000 a year. I told him I did not think it was possible for those men in the business to pay any such rent, it was too risky. Well, the Professor replied, we have to take some risk. Well, I said, I should rather, if I was in your place, hold my stock and my interest in the bank. I think it is better or

safer. He said he did not like the way they were doing
business, he did not like the style, and a large share of the
bank's capital was tied up in real estate and there was no
prospect of dividends, and he preferred to do his own business
and manage his own affairs. That is all there was to that
conversation. Q. Did you have any subsequent conversation
with him about the matter? A. Well, yes. I guess it was
after he made the trade, either he told me about it or I took
occasion to remark, I see you made that trade, Professor.
Yes, he says, I did; he says, as I told you before I don't like
Mosher and Outcalt's ways of doing business, and I shall
prefer to manage my own affairs hereafter. Q. Did he, in
any conversation you had with him, say anything about the
amount of the capital stock of the bank that was tied up in
real estate? A. Yes, some 130 or 140 thousand dollars, about
140,000 he said was tied up. Q. Do you remember about
the time when the last dividend of the bank was returned?
A. It was a dividend of four per cent declared in July, 1892;
that is the last dividend I was credited with. Q. Did you
have any talk with the respondent, A. P. S. Stuart, as to
whether a dividend would be returned the first of January,
1893, or for the close of the year 1892? A. Well, only this,
the Professor told me that in all probability there would be
no dividend declared in January, owing to the fact that a
large amount of the bank's capital was tied up in real estate,
and until the amount was reduced and property converted
into cash the bank could not pay any dividend."

His cross-examination was as follows: "Q. You say, Mr.
Gerner, that he said he did not like the way that Mosher and
Outcalt did the business. Did he give you in detail the
management of that business he objected to, or was that the
sum total of his remarks, that he did not like the way they
did business? A. He says, oh, yes, he made comments on
Mosher's being in so many things and having so many irons
in the fire and paying too much attention to outside matters.
As to Outcalt, I do not know whether the Professor made
any comments on his conduct or not. Q. And the reason he
gave you at that time for getting out was because he wanted

to manage his own business, and he did not like the way they managed the business? A. He did not like the way they conducted the business."

Without referring to other facts and circumstances disclosed by the record, it is sufficient to say that the Circuit Court was justified by the evidence in finding that Stuart, with knowledge of the insolvency of the bank, or at all events with such knowledge of facts as reasonably justified the belief that insolvency existed or was impending, sold and transferred his stock with the intent to escape the individual liability which the statute imposed upon shareholders of national banks for their contracts, debts and engagements. And the bank having been, in fact, insolvent at the time of the transfer of his stock — which fact is not disputed — he remained, notwithstanding such transfer, and as between the receiver and himself, a shareholder, subject to the individual liability imposed by section 5151. We will add, that as the Circuit Court and the Circuit Court of Appeals agreed as to what were the ultimate facts established by the evidence, this court should accept their view as to the facts unless it clearly appeared that they erred as to the effect of the evidence. *Morewood* v. *Enequist*, 23 How. 491; *The Ship Marcellus*, 1 Black, 414, 417; *Dravo* v. *Fabel*, 132 U. S. 487, 490; *Compania de Navigacion* v. *Brauer*, 168 U. S. 104, 123.

In reference to the appeal by Gruetter & Joers but little need be said. The Circuit Court of Appeals correctly held that the cross-bill of Gruetter & Joers attempted to bring into this suit a new and independent controversy, in which the receiver of the bank had no interest, and which could be determined upon facts not material to the issue between the original plaintiff and Stuart. The Circuit Court of Appeals also held the cross suit to be objectionable upon additional and, we think, entirely sufficient grounds. Judge Sanborn, speaking for that court, said: "The supposed crossbill utterly fails to state a case for rescission, because it does not show that Gruetter & Joers ever returned to Stuart the nineteen thousand five hundred dollars in cash which they received from this trade, or that they ever released Stuart

from his agreement to pay the mortgage of thirty thousand dollars upon the property they conveyed. They could not rescind this trade and recover back that which they gave in exchange, or any part of it, while they retained at least forty-nine thousand five hundred dollars in value that they had received from it. The proof, if it were possible, is more fatal to them than the pleading. The record discloses the fact that they made their election and chose to affirmatively ratify this transaction more than a year before they filed this bill for its rescission. It shows that on January 23, 1893, they brought an action at law against Stuart in one of the courts in the State of Nebraska to recover of him damages to the amount of eighteen thousand dollars for his fraudulent misrepresentation of the value of this stock at the time of the trade. This was in effect an action for a part of the purchase price of the real estate which they had conveyed, although it was in form an action for deceit. It could be brought and maintained on the ground that the sale or trade of the real estate was valid and its title was vested in Stuart, and on no other theory. That suit is still pending. It was a distinct and affirmative ratification of the transfer of this stock and the conveyance of the real estate, after full knowledge of all the facts, and it barred Gruetter & Joers of all right to rescind the trade thereafter. The result is that all that portion of the decree which grants to Gruetter & Joers any relief against the appellant Stuart was wrong."

> *The decree of the Court of Appeals is affirmed, but without prejudice to the prosecution of any claim that Gruetter & Joers may have against Stuart arising out of the transactions between them.*