### McDONALD v. DEWEY et al.

### DEWEY v. McDONALD.

#### (Circuit Court of Appeals, Seventh Circuit. January 3, 1905.)

#### Nos. 1,054, 1,081.

1. NATIONAL BANKS—LIABILITY OF STOCKHOLDERS—EFFECT OF TRANSFER OF STOCK.

To establish the liability of a stockholder in a national bank to creditors, on its failure, after he has made an actual out-and-out sale of his stock, and the same has been transferred on the books, although the sale may have been made for the purpose of avoiding liability, three things must concur: (1) The bank must have been insolvent when the sale was made; (2) the seller must have known such fact, or be chargeable with knowledge of it; and (3) the transfer must have been made to one who was insolvent or unable to respond to an assessment, and whose financial condition was known, or ought to have been known, to the seller.

[Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Banks and Banking, § 916.]

2. SAME—FAILURE TO HAVE TRANSFER REGISTERED.

A stockholder in a national bank remains liable to creditors so long as the stock stands in his name on the books, although he may have sold it and delivered the certificate to the purchaser, unless he has done all that he can reasonably do to have the same transferred, by seeing that the certificate is delivered to the bank, with the proper power of attorney and data to enable the officers to make the transfer.

[Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Banks and Banking, §§ 916–918.

Who are liable as shareholders in national banks, see note to Beal v. Bank, 15 C. C. A. 130; Earle v. Carson, 46 C. C. A. 503.]

Grosscup, Circuit Judge, dissenting.

Appeal and Cross-Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The appellant receiver brought this suit against the appellees named in the title of cause 1,054 to avoid certain alleged fraudulent transfers of stock and to recover from the transferror, Charles P. Dewey, an assessment of $86 a share on 105 shares in the defunct bank.

The bill alleged in substance that the bank failed and became insolvent on May 20, 1897; that the receiver was appointed and took possession on June 5, 1897; that on September 14, 1897, the Comptroller levied an assessment of $86 upon each share; that on May 8, 1894, Dewey was the registered owner of 105 shares; that the bank was then and continuously until its suspension insolvent, and Dewey knew it; that on May 8, 1894, Dewey assigned 95 shares, and on January 3, 1895, his remaining 10 shares, to Frederick L. Jewett, who was irresponsible; that this assignment was colorable only and was made by Dewey for the purpose of evading his liability as stockholder; that Jewett subsequently made transfers of stock so that, when the bank suspended, the 105 shares formerly standing in the name of Dewey stood upon the records of the bank as being owned as follows, Andrew K. Park 6 shares, William Mathison 4 shares, Jules W. Jouvenat 10 shares, Emile Jouvenat 10 shares, G. C. Hatcher 30 shares, A. C. Kendig 20 shares, and F. L. Jewett 25 shares; that these transfers were made when the bank was insolvent, and for the purpose of evading the liability for an assessment, and to persons who were irresponsible and unable to respond to an assessment, as Dewey knew or ought to have known.

Dewey answered, denying that the bank was insolvent in May, 1894, or at any time prior to 1897, and denying therefore that he knew or had means of knowing of the bank's alleged insolvency from May, 1894, to January, 1895, when he assigned his stock; averring that the assignment to Jewett was made for the purpose of enabling Jewett to hold the shares as Dewey's agent, and that the subsequent transfers were made by Jewett for Dewey; denying that the purpose of disposing of his stock was to evade liability as stockholder; averring that the sales were outright and for the par value of the stock; denying that the purchasers were irresponsible and unable to respond to an assessment; averring that he had sold all his stock and that transfers, except as to 25 shares, were duly made on the bank's books prior to suspension; neither affirming nor denying the transfer of the 25 shares on the bank's books, but requiring the complainant to make strict proof in that regard.

The court found that the bank was organized in 1885 with a capital of 500 shares of $100 each, of which Dewey owned 105 in 1894; that Jewett acted as Dewey's agent; that Dewey sold his stock through Jewett in December, 1894, and January, 1895; that the bank was then insolvent and Dewey knew it; that 80 shares were transferred on the books of the bank to the purchasers before the bank suspended; that when the bank suspended and went into the hands of the receiver 25 shares still stood and now stand on the bank's books in the name of Jewett as Dewey's agent; that in January, 1895, after the sale of all his stock, Dewey "notified the president of the bank by letter that he was no longer a stockholder in the bank and directed that his name as vice president should be erased from the stationery of the bank, and again about a month later wrote a second letter to the president of the bank to the same effect and protesting against the further use of his name on the stationery of the bank"; that of the bank's debts when Dewey sold his stock only $2,787.90 remained unpaid when the bank suspended, and of this Dewey's ratable share was $585.48.

From the decree fixing Dewey's liability at $585.48 and interest, the receiver appeals, and Dewey presents a cross-appeal.

Sections of the national banking act that need to be referred to are these:

"Sec. 5139. The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and transferable on the books of the association in such manner as may be prescribed in the by-laws or articles of association. Every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares; and no change shall be made in the articles of association by which the rights, remedies, or security of the existing creditors of the association shall be impaired."

[U. S. Comp. St. 1901, p. 3461.]

(The shares of this Nebraska bank were transferable only on the books of the bank, in person or by attorney, on surrender of the certificate that represented the shares proposed to be transferred.)

134 F.—34

"Sec. 5210. The president and cashier of every national banking association shall cause to be kept at all times a full and correct list of the names and residences of all the shareholders in the association, and the number of shares held by each, in the office where its business is transacted. Such list shall be subject to the inspection of all the shareholders and creditors of the association, and the officers authorized to assess taxes under state authority, during business hours of each day in which business may be legally transacted. A copy of such list, on the first Monday of July of each year, verified by the oath of such president or cashier, shall be transmitted to the Comptroller of the Currency."

[U. S. Comp. St. 1901, p. 3465.]

"Section 5151. The shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares.  *  *  *"

[U. S. Comp. St. 1901, p. 3498.]

Other facts are stated in the opinion.

F. M. Hall and E. E. Prussing, for plaintiff McDonald.

A. E. Harvey and R. S. Thompson, for defendant Dewey.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

Dewey's assignment of his shares to Jewett did not affect the question of his liability, for the transaction was not an out-and-out sale, but merely established agency. National Bank v. Case, 99 U. S. 628, 25 L. Ed. 448.

Jewett for Dewey sold 80 shares out-and-out and the transfers thereof were duly made on the books of the bank. The statute says that national bank shares shall be deemed personal property. The full quality of salability is emphasized in Earle v. Carson, 188 U. S. 42, 23 Sup. Ct. 254, 47 L. Ed. 373. So far as the statute declares, the seller who has his shares transferred on the books of the bank to his purchaser ends his liability as a stockholder. "Every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares." If the English rule, as stated in National Bank v. Case, supra, had been adopted in this country, Dewey could not be held to any liability on account of the 80 shares transferred on the books (for the sale was out-and-out) and the purchasers would have succeeded to all the rights and all the liabilities of Dewey as stockholder.

The American rule is better, we think, and holds the former stockholder under certain conditions, even if he has made an out-and-out sale of his shares and has caused the proper transfers to be made on the books of the bank.

What are the conditions without the existence of which such a former stockholder cannot be held?

He cannot be held, unless the bank was insolvent at the time of the transfer, for the creditors would not be injured. If they should ever sustain loss, it would be by reason of the bank's subsequently becoming unable to pay its obligations. But the negative does not

affirm that such a former stockholder is liable to assessment by the comptroller if the bank ultimately (perhaps years later) goes into the hands of a receiver, simply from the fact that the bank, when he transferred his shares, was insolvent in the sense that if it then went into liquidation the assets would not discharge all the liabilities.

He cannot be held, unless he know or ought to have known that the bank was insolvent at the time of the transfer; for an out-and-out sale, found to have been made in good faith, cannot be impeached. But this negative does not affirm that he is liable if merely the two conditions concur, insolvency and his actual or imputed knowledge thereof. In this case, however, it is asserted that the concurrence of the two conditions establishes liability, and, furthermore, that the liability is not merely for the debts at the time of the transfer which remain unpaid at the time of the ultimate failure and suspension, but is for the amount of the deficiency in the assets to pay the debts at the time of the transfer, which amount flows onward like a river into the ultimate failure and suspension. It is obvious that it is unnecessary to cast even a curious glance at the second contention, if the first is untenable. We apprehend no true reason for holding that the mere concurrence of the bank's insolvency and the stockholder's actual or imputed knowledge thereof inevitably and without any other condition establishes the bad faith, the fraudulent intent, of the selling stockholder. His obligation to creditors is contractual, just as much as if he had entered into a written engagement with each person who was a creditor when he became a stockholder and with each person who became a creditor while his name stood on the books of the bank as a stockholder. If at a particular time, as might be proven years later when the bank suspended, the bank, although then a going concern and meeting all its obligations from day to day as presented, should be unable, if then put into liquidation, to pay its debts in full, and if, by reason of his knowledge of such a condition, a stockholder could not dispose of his shares without having fixed upon him a liability to respond in the indefinite future to the comptroller's assessment after the bank's ultimate failure and suspension, national bank stock would not be very desirable property to own, its saleability in the market, which is a prominent feature in the statute's scheme, would be largely destroyed, and a condition would inevitably result which the law should discourage and not create, that the stockholder would be industrious in not knowing the affairs of his bank and very forgetful of anything that obtruded itself upon his attention. The receiver in this case does not concede that the supposed liability (whether for particular unpaid debts or for the stream of debts) would end if, at a time between the transfer and the ultimate failure and suspension (two years and five months in the present instance), the bank should become prosperous and abundantly able to discharge all of its obligations out of its assets. The supposed liability would charge the selling stockholder with the fraudulent intent to cheat the bank's creditors, even though he had diligently sought and had succeeded in finding a purchaser who was willing

to take the chances of the bank's ultimate failure and suspension and who was amply able to respond to an assessment. We conceive that a sale of the character instanced could be made in perfect good faith, that the transfer of the shares could be effected on the books of the bank in accordance with the statute and the by-laws of the bank, and that, again in accordance with the statute, the purchaser would succeed to all the rights and all the liabilities of the former holder of such shares. But even if it were conceded that such a sale, in and of itself, conclusively evidenced the bad faith and fraudulent intent of the seller, a right of action in the receiver as the representative of the creditors would not be established. Surely, if the purchaser responded to the assessment levied on the transferred shares, the receiver should not be permitted to maintain a suit against the seller. Surely, if the purchaser was able and compellable to respond, the receiver should not be permitted to sue the seller or the purchaser at his election, but should be required to collect from the purchaser who had succeeded to all the rights and liabilities of the seller. It is not enough that a sale be fraudulent as to creditors—the creditors must be injured by the fraud; and they are not injured if they have a direct and primary means of collecting their debts, without resort to the secondary means of setting aside the fraudulent sale. The argument results in the conclusion that the mere concurrence of the bank's insolvency and the selling stockholder's actual or imputed knowledge thereof does not make out a case. The two conditions named must be accompanied by a third.

He cannot be held unless his out-and-out transfer was made to an irresponsible person, unable to respond to an assessment, whose financial condition was known or ought to have been known to him. With respect to knowledge of the purchaser's insolvency, it might be fair to hold that the seller, having knowledge that the assets of the bank would be insufficient, if the bank were then to go into liquidation, to meet fully its obligations, is chargeable with notice of the purchaser's insolvency, unless he be able to establish affirmatively that he had made reasonably diligent inquiry and had been misled or had been unable to discover the true financial condition of his intending buyer.

The necessity of the concomitance of the three conditions hereinabove stated is established by the case of Bowden v. Johnson, 107 U. S. 251, 261, 262, 2 Sup. Ct. 246, 27 L. Ed. 386.

There are some expressions in Stuart v. Hayden, 169 U. S. 1, 18 Sup. Ct. 274, 42 L. Ed. 639, which, if taken out of their context and separated from the pleadings and evidence, might seem to countenance the contention that averment and proof of the third condition is unnecessary. On reference to the case in the Circuit Court of Appeals for the Eighth Circuit (Stuart v. Hayden, 36 U. S. App. 462, 72 Fed. 402, 18 C. C. A. 618), it will be found that the bill averred that the transferees were insolvent; that the answer of the transferror relied on his ignorance of the bank's insolvency and his good faith in making the sale, but did not deny the insolvency of his transferees; and that the answer of the transferees "was in effect an admission of the averments of the bill." There was thus a virtual default as to the third condition, and it is fair to suppose that the transferror's argument in the Supreme

Court was confined to the defense made in his answer. And the expressions in the opinion which are relied on have in the main been explained in Earle v. Carson, 188 U. S. 42, 23 Sup. Ct. 254, 47 L. Ed. 373.

In Earle v. Carson, supra, the court quotes the rule as stated by Mr. Thompson:

"A transfer of shares in a failing corporation, made by the transferror with the purpose of escaping his liability as a shareholder, to a person who, from any cause, is incapable of responding in respect to such liability, is void as to the creditors of the company and to other shareholders, although as between the transferror and transferee it was out-and-out."

And under the third heading of the opinion the court holds that the transferror must be chargeable with knowledge of the transferee's insolvency.

In this case the bill charges the existence of the third condition. As the finding of the court, in which we agree so far as it goes, is silent respecting the truth of the averment, it has been necessary for us to examine the evidence in that particular. Without stating the items, it is enough to say that we all agree that there is an utter failure of proof of the insolvency of the various transferees, and, on the contrary, there is considerable proof that they were solvent and able to respond to an assessment.

As to the other 25 shares, Jewett for Dewey indorsed the necessary assignments and powers of attorney upon the certificates and delivered them to the purchasers in Chicago, but no transfers on the books of the bank were ever made.

The general rule (see Whitney v. Butler, 118 U. S. 655, 7 Sup. Ct. 61, 30 L. Ed. 266; Richmond v. Irons, 121 U. S. 27, 7 Sup. Ct. 788, 30 L. Ed. 864; Matteson v. Dent, 176 U. S. 521, 20 Sup. Ct. 419, 44 L. Ed. 571; Earle v. Carson, 188 U. S. 42, 23 Sup. Ct. 254, 47 L. Ed. 373) is thus stated in Whitney v. Butler:

"In nearly all of" the cases, "where the issue was between the receiver, representing the creditors, and the person standing on the register of the bank as a shareholder, it is said, generally, that the creditors of a national bank are entitled to know who, as shareholders, have pledged their individual liability as security for its debts, engagements, and contracts; that if a person permits his name to appear and remain in its outstanding certificates of stock, and on its register, as a shareholder, he is estopped, as between himself and the creditors of the bank, to deny that he is a shareholder; and that his individual liability continues until there is a transfer of the stock on the books of the bank, even where he has in good faith previously sold it and delivered to the buyer the certificate of stock, with a power of attorney in such form as to enable the transfer to be made. Some of the cases hold that the seller is liable as a shareholder even where the buyer agreed to have the transfer made on the books of the bank, but fraudulently or negligently failed to do so. But it will be found, upon careful examination, that in no one of the cases in which these general principles have been announced, as between creditors and shareholders, does it appear that the precaution was taken, after the sale of the stock, to surrender the certificates therefor to the bank itself, accompanied (where such surrender was not by the shareholder in person) by a power of attorney, which would enable its officers to make the transfer on the register. The position of the seller, in such case, is analogous to that of a grantor of a deed deposited in the proper office to be recorded. The general rule is that the deed is considered as recorded from the time of such deposit. 2 Washburn on Real Prop. bk. 3, c. 4, par. 52. Where the seller delivers the stock certificate

and power of attorney to the buyer, relying upon the promise of the latter to have the necessary transfer made, or where the certificate and power of attorney are delivered to the bank without communicating to its officers the name of the buyer, the seller may well be held liable as a shareholder until, at least, he shall have done all that he reasonably can do to effect a transfer on the stock register."

In Earle v. Carson it was said that the presumption of liability begotten by the presence of the name on the stock register is overcome by a finding that a bona fide sale had been made and that the seller had performed every duty which the law imposed on him to secure a transfer on the register of the bank. In the Whitney and Earle Cases the certificates, with the proper assignments and powers of attorney, were delivered to the bank. Whether, in view of the comparison of the bank to the office of the registrar of deeds, anything short of an actual delivery to the bank of the certificates with the proper assignments and powers of attorney, would be sufficient, is a question unnecessary to consider, because Dewey's letters to the bank fall far short of being all that he reasonably could have done to effect a transfer on the books. He failed to identify the various certificates for the 25 shares, to give the names and residences of the purchasers, and to connect each purchaser with the shares purchased by him. So, if the officers of the bank would have been justified, on the mere assertion of Dewey, in making the transfers on the books of the bank, it is evident that they could not have done so in the absence of the necessary data.

GROSSCUP, Circuit Judge (dissenting). In the conclusion of the court, respecting the twenty-five shares of stock, I concur. From the conclusion of the court, respecting the remaining eighty shares, I feel obliged to dissent.

Preliminary to a statement of the reason for my dissent, I note two facts not brought out pointedly in the majority opinion, but clearly established by the record. The first of these is, that the final suspension of the bank, though it occurred two years and five months after Dewey's transfer of stock, is traceable, in the line of cause and effect, to the insolvency of the bank at the time of the transfer; that is, the suspension when it did occur, was not wholly the outcome of intervening causes, but was the direct outcome, in part at least, of causes existing at the time of the transfer.

The second fact is this: That though so far as the record discloses, Dewey transferred his shares to people not shown to have been insolvent, the motive that actuated the transfer, so far as Dewey was concerned, was to escape his liability as a stockholder in a bank that he knew to be insolvent.

These facts the majority opinion seems to accept. The opinion proceeds, as I understand it, upon the proposition of law, that though the final suspension was in line of cause and effect of insolvency existing at the time of the transfer, and though the transfer was made with the insolvency of the bank in mind, and to escape liability as a stockholder, nevertheless no liability attaches, because, before liability can attach, it must be shown, in addition to the facts stated, that transfer was made to persons themselves insolvent, or to persons who, for some good reason, could not be made to respond to the stockholders' liability. In the

opinion of the majority, before liability attaches three facts must be concomitant, viz.: Insolvency, the stockholders' knowledge thereof, and a transfer to persons themselves insolvent, or unable for any reason to respond; and the absence of any one of these facts defeats a right of action.

Stuart v. Hayden, 169 U. S. 1, 18 Sup. Ct. 274, 42 L. Ed. 639, as I read that case, is a direct authority against that proposition. Though in that case the bill averred the insolvency of the transferees, the averment was controverted by the answer, and there was no finding of the court that such insolvency existed; and the language employed by Mr. Justice Harlan, upon which the judgment proceeded, seems to me to expressly exclude the element of insolvency of the transferees as a condition to be established before there could be recovery by the receiver:

"One who holds such shares," said Mr. Justice Harlan, "the bank being at the time insolvent—cannot escape the individual liability imposed by the statute by transferring his stock with intent simpy to avoid that liability, knowing or having reason to believe at the time of the transfer on the books of the bank (Richmond v. Irons, 121 U. S. 27, 58, 7 Sup. Ct. 788, 30 L. Ed. 864), that it is insolvent or about to fail. A transfer with such intent, and under such circumstances, is a fraud upon the creditors of the bank, and may be treated by the receiver as inoperative between the transferer and himself, and the former held liable as a shareholder without reference to the financial condition of the transferee. The right of creditors of a national bank to look to the individual liability of shareholders, to the extent indicated by the statute, for its contracts, debts, and engagements, attaches when the bank becomes insolvent, and the shareholder cannot, by transferring his stock, require creditors to surrender this security as to him, and compel the receiver and creditors to look to the person to whom his stock has been transferred. * * * If the bank be solvent at the time of the transfer, that is, able to meet its existing contracts, debts and engagements, the motive with which the transfer is made is, of course, immaterial; but if the bank be insolvent, the receiver may, at least, without suing the transferee and litigating the question of his liability, look to those shareholders who, knowing or having reason to know, at the time, that the bank was insolvent, got rid of their stock in order to escape the individual liability to which the statute subjected them."

I do not acquiesce in the suggestion that this language is inadvertent, or that Earle v. Carson, 188 U. S. 42, 23 Sup. Ct. 254, 47 L. Ed. 373, was intended to overrule it. The principle formulated in Stuart v. Hayden applied precisely to the case there decided—a case in which insolvency of the transferees, apparently, was not considered as an element or condition of recovery—while Earle v. Carson, also, had no concern with the insolvency of the transferees as a condition essential to recovery. The question in Earle v. Carson was, whether the bank being insolvent, the transferror could be held to stockholder's liability notwithstanding his want of knowledge of such insolvency.

What seems to me to be a reasonable interpretation of the National Banking Act leads to the same conclusion. That act was framed as a practical measure to meet practical conditions. Its chief purpose, unquestionably, was to make these banking associations safe as institutions authorized to issue currency, and to accept deposits. Accompanying this was the further purpose that the share of the bank, like other forms of property, should be freely saleable. But the latter purpose, plainly, was subsidiary to the former.

To carry out the chief purpose—security to the depositors—the act gives the depositor a succession of safeguards. The government is required periodically to inspect the bank; the government is given the summary right to close up the bank; and the stockholder, in the act of becoming such, collaterally contracts, to the extent of his stock, equally and ratably with others, that he will be liable for the contracts, debts and engagements of the bank.

Now to what extent is this third safeguard, the collateral contract, a fixed liability? Under what circumstances was it intended that the liability might be shifted to another? Section 5139 [U. S. Comp. St. 1901, p. 3461] of the National Banking Act provides that the shares shall be transferable on the books of the association, and that every person becoming a shareholder by such transfer, shall, in proportion to his shares, succeed to all rights and liabilities of the prior holder. But under what circumstances was this intended to release the prior holder from his liability? The answer to this question determines the law applicable to the transfer of the eighty shares under consideration.

Practically, there is a great difference, so far as the security of the depositors is concerned, between transfers of stock by stockholders, in the usual course of purchase and sale of bank stock, and transfers made solely to avoid liability. In the transfers of shares in the usual course of purchase and sale, the shares ordinarily pass from substantial and solid interests to substantial and solid interests; while in transfers to escape liability, the shares are apt to go to adventurers, or to others who themselves have something doubtful to trade off. True, the transferees in either case may, technically, be solvent; but the National Banking Act looked, not to solvency only, but to security— to the kind of security one desires when he is parting with his money on the credit of an endorser. Solvency, alone, does not make an endorser desirable. The personality of the endorser—his condition as a sold and safe, as well as a solvent man—is a prime consideration; for, though solvent, an endorser's credit may be so bad, or his business so speculative or otherwise precarious, that no one would be willing to extend credit upon his collateral obligation.

In the framing of the National Banking Act, congress must be assumed to have had in mind these practical considerations. To say that congress, wishing so far as could be done with safety, to make shares saleable, could have entertained no fear that depositors would be hurt in their security by transfers of stock in the usual course of bank stock purchase and sale, is to say, what in the long run is true; for in such transfers the stockholder is usually replaced by a stockholder equally desirable. But to say that congress could not see that depositors would be hurt in their security by transfers made by stockholders fleeing from an insolvent bank, and solely to escape their liability on account of the insolvency of the bank, is to assume that congress disregarded human nature, and all the teachings of experience. To my mind it is clear that it was not intended in the National Banking Act, that the stockholder should be able to drop his liability to depositors, whose deposits were made on the credit of his liability, by the simple device of a transfer; unless the transfer was made, not simply out and out, but in that good faith, also, that goes with the usual course

of bank stock purchases and sales; and this would exclude, clearly, a transfer made simply to escape the obligations growing out of known insolvency.

The statute thus interpreted, Dewey would be liable to the creditors of the bank, not only on the twenty-five shares, but on the eighty shares also. What now, is the measure of that liability? Does it run to the creditors severally, so that only those who were creditors at the time of the transfer may enforce it, or does it run to the creditors en banc, irrespective of when they become creditors, to be enforced by the receiver as an asset of the bank? Is it a liability for the deficit as it existed at the time of suspension, or for the deficit as it would have existed at the time of the transfer, had the suspension then taken place?

Answering these questions in the order named, I am of the opinion that the contracts, debts and engagements of the bank for which Dewey was liable, are not to be held to be the contracts, debts and engagements due to the creditors individually. The liability is for the contracts, debts and engagements of the bank as a unity—a continuous unity, like a continuous stream, changing from time to time in volume, but still the same stream. The depositor who, when Dewey was a stockholder, deposited his money in the bank, and thus became a creditor, is not the only person interested in Dewey's contract to make good, under certain circumstances, the debts, contracts, and engagements of the bank. He who, the next day after Dewey sold his stock, deposited his money, is equally interested; for such latter depositor, unless all safeguards such as this fail, had the right to rely upon the fact, that in the hour of Dewey's withdrawal as a stockholder, the assets of the bank were more than equal to its liabilities, or in case a deficit existed, that the then stockholders would be subject to call to make up such deficit.

Answering the second question, I think, that the measure of liability is the deficit that would have existed had the bank liquidated at the time the transfer was made. Dewey, though knowing of the bank's insolvency, was under no entire disability respecting the sale of such stock. Could a purchaser be found, solvent or insolvent, Dewey could transfer to him his stock. But in case it was not made in the good faith referred to, the transfer would not release his existing liability for the then contracts, debts and engagements of the bank. Now the measure of that liability, had it then been ascertained, would have been the difference between the bank's liabilities and its assets. That the bank was not then suspended, that the deficit was not then ascertained, and made good, cannot be charged to Dewey; for it was no part of his duty, and probably was beyond his power, to bring about a suspension of the bank.

The construction given to the national banking law thus outlined, seems to me to be the one that most nearly meets the just purpose that must have been in the mind of congress. Thus construed, the act is not an embargo upon free disposal of this kind of property by the holder of the property; nor does it on the other hand afford a premium to him who manages to get out stealthily, before the suspicions of the government are awakened, or the depositors of the bank advised.

The decree, according to my view, should have required that an ac-

counting of the liabilities and assets of the bank be taken, as of the day that Dewey transferred his shares, and that ratably with other shareholders, as of that day, Dewey be held liable to the receiver of the bank for the deficiency found to exist. Such a decree would do Dewey no injustice, would do the creditors no injustice, and would carry out, according to my judgment, the plain purposes and spirit of the National Banking Act, as shown in all its provisions—those calculated to promote the interests of the stockholders, as well as those calculated to protect the interests of the depositors.

On the cross-appeal, the decree is affirmed; on the appeal, the decree is reversed, with a direction to enter a decree against Dewey for his full assessment on the 25 shares and for interest thereon. .