## BOWDEN *v.* JOHNSON.

1. Where the holder of shares of stock in a national bank, who is possessed of information showing that there is good ground to apprehend the failure of the bank, colludes with an irresponsible person, with the design of substituting the latter in his place, and thus escaping the individual liability imposed by the provisions of sect. 12 of the act of June 3, 1864, c. 106, and transfers his shares to such person, the transaction is a fraud on the creditors of the bank, and the liability of the transferrer to them is not thereby affected.

2. A bill in equity filed by the receiver of the bank against the transferrer and transferee to enforce such liability will lie where it is for discovery as well as relief, the transfer being good between the parties, and only voidable at the election of the complainant.

3. A letter of the Comptroller of the Currency, addressed to the receiver; directing him to bring suit to enforce the personal liability of every person owning stock at the time the bank suspended, is sufficient evidence that the decision of the Comptroller touching such personal liability preceded the institution of the suit. The liability bears interest from the date of the letter.

4. The decree below, dismissing the bill, was entered after a new receiver had been appointed. An appeal to this court was taken in the name of the old receiver, as the complainant, the new receiver becoming a surety in the appeal bond. In this court the new receiver was, on his motion, substituted as the complainant and appellant, without prejudice to the proceedings already had; and the motion of the appellees to dismiss the appeal was denied.

APPEAL from the Circuit Court of the United States for the District of New Jersey.

The case is stated in the opinion of the court.

*Mr. John A. J. Creswell* for the appellant.

*Mr. Thomas N. McCarter* for the appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

George E. Bowden, as receiver of the First National Bank of Norfolk, Virginia, brought this suit in equity against Jacob C. Johnson and Mrs. B. Valentine, alleging, in the bill, that Johnson, owning one hundred and thirty shares of the capital stock of the bank, of $100 each, in order to exonerate himself from liability to the creditors of the bank, transferred said shares to Mrs. B. Valentine, on the books of the bank ; that the transfer was made without legal consideration, and with a view to such exoneration ; that Mrs. B. Valentine is, and was known by Johnson, at the time of the transfer, to be, utterly insolvent ; that the transfer was made with a view of defrauding the creditors of the bank, and, therefore, was and is void ; and that the plaintiff had been appointed, by the Comptroller of the Currency, receiver of the bank, and had been directed by said Comptroller to proceed to enforce the personal liability of all persons owning the capital stock of the bank on the 26th of May, 1874, the day on which the bank failed to redeem one of its circulating notes and was in default in the payment of its circulating notes generally. The bill alleges that Johnson visited Norfolk for the purpose of examining into the condition of the affairs of the bank, and, becoming satisfied from such examination, and from other information in relation to the bank, that its affairs were in a critical condition, as in fact they were, and that a suspension of the bank was inevitable, returned to New York and immediately thereafter made said transfer. The prayer of the bill is, that Johnson and Mrs. B. Valentine answer it on oath ; that the transfer of the stock be set aside ; and that Johnson be decreed to pay to the plaintiff, as such receiver, the par value of the one hundred and thirty shares.

The joint answer of the defendants admits that Johnson

became the owner of the one hundred and thirty shares in 1869. It avers that he visited Norfolk in November, 1873, but not for the purpose of examining into the condition and affairs of the bank. It denies that he, on said visit, became satisfied that the affairs of the bank were in a critical condition and that a suspension of the bank was inevitable. It avers that he went to Norfolk, at that time, to inspect a farm which it was proposed to exchange with him for said stock. It denies that he " then, during that visit, or at any other time, saw anything in the condition of the said bank," except that William Lamb, who was at that time the president of the said bank, and who went with Johnson to inspect said farm, at the same time proposed that Johnson should lend to the bank $25,000, and proposed to secure the loan by mortgage on the real estate of the bank, which loan Johnson declined to make. Johnson admits that he, on Dec. 5, 1873, sent his said stock to the bank, with the power and direction to have the same transferred to Mrs. Valentine, but he denies expressly that such transfer was made in order to exonerate himself from liability to the creditors of the bank. The answer avers that the actual transfer of the stock, on the books of the bank, was delayed for some time, without the knowledge and against the will of the defendants. It denies that the transfer of the stock was made without legal consideration, or with any view to exonerate Johnson from liability as stockholder. It denies that the defendant Valentine is or was, at the time of said transfer, known by Johnson " to be utterly insolvent, or that such transfer was made with a view of defrauding the creditors " of the bank. It avers that it is not true that Mrs. Valentine was, at the time of said transfer, insolvent, or that said transfer was made for any such purpose as is alleged in the bill, but avers that it was made in good faith and for a valuable and lawful consideration.

The principal question in this case is as to the circumstances attending the transfer of the stock to Mrs. Valentine. This question divides itself into two branches: 1. The information which Johnson had in regard to the affairs of the bank; 2. The real nature of the transaction between Johnson and Mrs. Valentine.

1. Lamb, the president of the bank, gives the following tes-

timony: In the latter part of 1873, Lamb, owing to the strait-
ened condition of the bank, was anxious to make a loan on its
real estate, and wrote to Mr. Cole, the former president, then
living in New York, to assist him in doing so. Cole wrote to
Lamb that he had a friend, Johnson, who he thought was able
to make the loan, and would do so if proper representation
could be made to him, and that he would bring Johnson down
to Norfolk. Some time in November, 1873, Johnson went to
Norfolk with Cole, when Lamb endeavored to get Johnson to
make a loan on the banking building of the bank. Lamb told
Johnson that the need of a loan was urgent, that he thought
the security was good, and he appealed to Johnson as a stock-
holder to make the loan. Johnson promised, when he returned,
to look into his affairs, and to make the loan if he could con-
veniently do so. Lamb says: "I cannot remember any of the
details of the conversation, nor the full extent given him by
me as to the condition of the bank, but my impression is that
I called attention to the fact that our capital had been seriously
impaired by the Elkton suit, and other litigation, and that the
panic had caused us to lose business and be very hard up, and
the necessity of having ready money to retain our business and
to recover our position. I think I asked for a loan of twenty-
five thousand dollars on the building. My conversation was
of such a confidential character as I would have only had with
one largely interested in the bank. . . . I don't remember
whether he examined the books and papers of the bank."
Lamb says that the Elkton suit was one in which a bank ob-
tained a judgment against his bank, after long and expensive
litigation, for $30,000; and that the result destroyed about one-
half of the capital stock of his bank, which was $100,000.

Chamberlain, who was cashier of the bank, says that John-
son visited Norfolk the latter part of November or about the
1st of December, 1873.

Hunter, who was book-keeper of the bank, and remembers
Johnson being at the bank, says that he believes the reports
and statements showing the condition of the bank, made up
by the witness as book-keeper, were taken into the president's
room while Johnson was in it, but he cannot state whether
they were exhibited to Johnson.

The foregoing is all the direct evidence there is as to Johnson's knowledge of the condition of the bank at the time he returned from Norfolk. Within a very few days after his return he wrote a letter to Lamb, dated Dec. 5, 1873, saying: "I regret to say that I will be unable to comply with your wishes in letting the First National Bank have $25,000. I cannot raise the money. . I was depending for the greater part of it on my folks in San Francisco, and they send me word that they cannot let me have the money, as they need all they can lay their hands on to get through the winter. The bulk of my means is in real estate and cannot readily be converted into cash. I have disposed of my stock in the First National Bank of Norfolk, and enclose certificate of my shares, with power of attorney, &c., to transfer. Please have the stock transferred to Mrs. B. Valentine, and send the certificate to her at Belleville, Essex County, New Jersey." This letter contained the certificate of stock, with the power of attorney to transfer it.

Lamb, instead of transferring the stock, wrote as follows to Cole, enclosing Johnson's letter: "I send you the enclosed to show you Mr. Johnson. Please let me know who Mrs. B. Valentine is. I shall make an assessment on our stockholders of 50 per cent. If she is not able to pay it I will not transfer the stock. Please return this letter." Cole replied: "Mrs. Valentine is the sister of Johnson, the wife of a poor man that Johnson employs on his farm. I would not transfer the stock, but notify him at once that you have made an assessment of 50 per cent."

These letters were written, Lamb says, in December, 1873. Lamb also says, that he was not satisfied from Cole's reply, but found, after obtaining legal advice, that he had no right to refuse the transfer, and therefore he made it, on Jan. 15, 1874.

On the 14th of February, 1874, Lamb wrote as follows to Johnson: "I find the enclosed certificate has not been forwarded to Mrs. Valentine, although issued a month ago; please hand it to her. I regret not hearing from you in regard to the proposition made by the directors. Something must be done at once. The bank cannot go on as affairs are now, and if I

surrender it to a receiver I know our stock will be worthless; the margin is too small. If I could have gotten the refusal of all the stock I might have induced some capitalists to come in, but I am afraid it is too late now. With $4,000 cash I could have infused new life into our stock and built it right up. Please let me hear from you, as I suppose you must feel an interest in Mrs. Valentine's stock."

Johnson did not offer himself as a witness.

2. Mrs. Valentine was called as a witness by the plaintiff. Her deceased daughter was the wife of Johnson. She herself was divorced from her husband, and he was not dead that she knew of. Johnson had no children. Her daughter died in 1864. She herself lived in California with her husband for thirteen years. She came from California in 1865 or 1866 and went to live at Mr. Johnson's house in Kearney Township, New Jersey, in 1871. She was examined as a witness in August, 1877. She endeavors to make out a consideration for the transfer of the stock to her, in this way : "Mr. Johnson owed me for services rendered after we came to live where we are. He was to pay me $1,000 a year for my services. He was away a great deal of the time, and I took care of everything while he was gone. He went away two winters to California, and I had the care and responsibility of everything — the entire place — while he was gone. . . . We have been at the place six years. He was away the second winter ; then two winters intervened, and he was away another winter. . . . Q. Please explain why Mr. Johnson should have paid you by the assignment of the Norfolk bank stock instead of money, if he was indebted to you and wished to make payment? A. Because I preferred that. He would have paid money if I had wished it. I thought it would be less trouble for me in that way, already invested, and I had to pay no taxes. Q. Did Mr. Johnson's engagement to pay you one thousand per year for services commence at the time you moved to Kearney Township, six years ago, as you have said? A. It did. Q. Mr. Johnson has not been indebted to you, has he, for any other matter or thing, except such service for the last six years? A. Since my daughter's death I have had all the charge of Mr. Johnson's clothes, and of his house at

San Francisco, and here also. There was no agreement be-
tween us for compensation till we came here to Kearney. I
always supposed he would compensate for these." " *Q.* What
price were you to allow Mr. Johnson in payment for that
stock? *A.* Fifty cents on the dollar; that was the price Mr.
Lamb, the president of the bank, offered for it at the time Mr.
Johnson transferred it to me." " *Q.* Did you suggest to him
or he to you the purchase of this stock? *A.* I really can't
tell. I think I proposed to him to take it instead of money.
I am not positive. I think that was the way." " *Q.* Please
explain, if you can, how you came to the knowledge that he
was the owner of the Norfolk bank stock. *A.* He told me that
he had the stock before he went to Norfolk to see the land
that he then thought of exchanging the stock for. I think
that was the first I knew of it. *Q.* And when he came back,
or soon after, he proposed to you to take the stock, did he not?
*A.* It was a long time after he came back; several months, I
think. *Q.* Are you not mistaken in saying it was several
months? *A.* It may not have been several months after; it
was some time after. *Q.* Really, Mrs. Valentine, on reflection,
was it more than one month? *A.* Perhaps not. I cannot re-
member. *Q.* When Mr. Johnson proposed that you should
purchase the stock, what did he propose? Please give me, as
near as you can, the language he used in relation thereto?
*A.* I cannot remember the language used." " *Q.* Have you
now, or had you at the time you took the assignment of this
stock from Mr. Johnson, any money, or any property, to pur-
chase the stock, other than the alleged indebtedness for annual
services rendered by you to Mr. Johnson? *A.* I am not de-
pendent entirely; I am not destitute; have enough to keep
me from want. "*Q.* Did you give any money or other valua-
ble thing to Mr. Johnson for the transfer of the stock other
than his alleged indebtedness to you for service? *A.* I told
him at the time he might consider all my jewelry his for part
compensation. *Q.* He did not accept of the jewelry, did he?
*A.* Well, it remained in the house, as it always had." "*Q.*
The stock that Mr. Johnson transferred to you was not paid
for by either your obligation or promise of payment further
than the alleged indebtedness to you, was it? *A.* It was not."

" *Q.* Had you, at that time, any other stock, bonds, bank account, or money in hand or on deposit in any bank or banks, or in any wise invested for you or for your use? *A.* I had no bank account, no stock. I am never without any money to use. I have no bonds. *Q.* The money that you had was merely pocket funds, of small amount, was it not? *A.* Yes, sir."

" *Q.* In what month was the arrangement made between you and Mr. Johnson about the stock? *A.* In December, 1873. *Q.* You stated, in reply to the 32d direct question, that you thought you proposed to Mr. Johnson to take the stock instead of money. Did you mean to be understood, by any subsequent answer, that the proposition for you to take the stock arose with Mr. Johnson? *A.* No."

The Circuit Court dismissed the bill, taking, as we think, an erroneous view of Mrs. Valentine's testimony in one important particular. It was assumed that she testified that she had had charge of Johnson's house and family since the death of Mrs. Johnson, in 1864, at the fixed compensation of $1,000 per year; that is, that the compensation was for taking charge of Johnson's house and family from 1864 until the stock was transferred in 1873, and that the compensation of $1,000 a year was fixed in 1864. Whereas, what Mrs. Valentine says expressly is, that the engagement to pay her $1,000 a year for her services commenced in 1871, when she moved to Kearney Township, and not till then; and that what Johnson owed her for was for services rendered after that. The winters Johnson was away were the winters of 1872 and 1875. At most, according to her own story, less than three years' services, at $1,000 a year, had been rendered by her when she took this stock at $6,500. No alleged indebtedness accruing subsequently to this transfer of the stock in December, 1873, can be looked at. She says she supposed Johnson would compensate her for what she had done before she went to Kearney in 1871, but she does not pretend that there was any such obligation recognized by Johnson, or any debt for the same. That she, knowing that the alleged indebtedness to her did not amount to the alleged price of the stock, was conscious that the transaction was not an honest one, is shown by her admission that the stock was not paid for by her to Johnson, by either her obli-

gation or promise of payment, further than the alleged indebtedness to her. This was less than $3,000 in December, 1873. To make up the difference between the indebtedness and the $6,500, she resorts to the bald suggestion that she told Johnson at the time that he might consider all her jewelry as his, "for part compensation" for the transfer of the stock, the jewelry remaining in the house as it always had. Equally bald is the suggestion that she was saving trouble in making an investment in a stock that was worth only fifty cents on the dollar.

The conclusion of the Circuit Court was that there was no bad faith or fraud in the transfer. But what are the facts proved? Johnson, being a stockholder, goes to Norfolk and has interviews with the officers of the bank in regard to making a loan of $25,000 to the bank. He is appealed to as a stockholder to make the loan. His position as a stockholder involved not merely the value of his stock, but his liability for $13,000 more. The urgency of the needs of the bank is pressed upon him. The facts that the capital of the bank had been impaired, and that it had lost business, are brought to his attention. The bank had made a dividend in July, 1870, and one in February, 1873, and none since. Can it be doubted, from the foregoing testimony and Johnson's subsequent action, that he examined into the affairs of the bank sufficiently to satisfy himself that the failure of the bank, and the loss of its entire capital stock, and the attaching of the statutory liability of the stockholders, were impending in the near future? He was at Norfolk the last of November or the first part of December. Mrs. Valentine says that the arrangement between her and him about the stock was made in December. He sends the certificate and the power to Lamb on the 5th of December. He loses no time in assigning his stock. Lamb understood what Johnson was doing. He sent to Cole the letter from Johnson, and directed Cole to inquire as to Mrs. Valentine's responsibility. He received information that she had none, and that she was Johnson's sister. With that knowledge he acted as Johnson's attorney in transferring the stock. He evidently thought there was no *bona fides* in the transfer, for, in his letter sending the certificate to Johnson, although Johnson

had instructed him to send it to Mrs. Valentine at a given address, he addresses Johnson as if he were still a stockholder. He refers to the future and to the necessity of doing something at once, and to the prospective worthlessness of the stock, and winds up with the sarcastic remark that he supposes John son must feel an interest in Mrs. Valentine's stock. Mrs. Valentine was wholly unable to respond for any liability as a stockholder. This was known to her and to Johnson. Johnson, notwithstanding all the testimony on the part of the plaintiff, is not sworn as a witness for himself. It is worthy of note, that the answer does not set forth what the consideration was for the transfer to Mrs. Valentine. The bill alleges that there was no legal consideration. The answer merely avers that the transfer was not without legal consideration, and that it was made in good faith and for a valuable and lawful consideration. It is manifest that, at the very best, on Mrs. Valentine's evidence, supposing it to be entitled to credit, and on her statement of the price at which she took the stock, there was only $2,500 of consideration, at the rate of $1,000 a year for two years and a half, leaving the transfer as to eighty shares of the stock without consideration. The entire theory of the defence is that there was a sale, and not that there was any gift.

The provisions of sect. 12 of the act of June 3, 1864, c. 106, which govern the present case, are as follows : " The capital stock of any association formed under this act shall be divided into shares of one hundred dollars each, and be deemed personal property and transferable on the books of the association in such manner as may be prescribed in the by-laws or articles of association; and every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares, and no change shall be made in the articles of association by which the rights, remedies, or security of the existing creditors of the association shall be impaired. The shareholders of each association formed under the provisions of this act, and of each existing bank or banking association that may accept the provisions of this act, shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the

amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares." The answer sets forth that Johnson became the purchaser and owner of the one hundred and thirty shares in 1869. As such shareholder, he became subject to the individual liability prescribed by the statute. This liability attached to him until, without fraud as against the creditors of the bank, for whose protection the liability was imposed, he should relieve himself from it. He could do so by a *bona fide* transfer of the stock. But where the transferrer, possessed of information showing that there is good ground to apprehend the failure of the bank, colludes and combines, as in this case, with an irresponsible transferee, with the design of substituting the latter in his place, and of thus leaving no one with any ability to respond for the individual liability imposed by the statute, in respect of the shares of stock transferred, the transaction will be decreed to be a fraud on the creditors, and he will be held to the same liability to the creditors as before the transfer. He will be still regarded as a shareholder *quoad* the creditors, although he may be able to show that there was a full or a partial consideration for the transfer, as between him and the transferee.

The appellees contend that the statute does not admit of such a rule, because it declares that every person becoming a shareholder by transfer succeeds to all the liabilities of the prior holder, and that, therefore, the liabilities of the prior holder, as a stockholder, are extinguished by the transfer. But it was held by this court in *National Bank* v. *Case*, 99 U. S. 628, that a transfer on the books of the bank is not in all cases enough to extinguish liability. The court, in that case, defined as one limit of the right to transfer, that the transfer must be out and out, or one really transferring the ownership as between the parties to it. But there is nothing in the statute excluding, as another limit, that the transfer must not be to a person known to be irresponsible, and collusively made, with the intent of escaping liability, and defeating the rights given by statute to creditors. Mrs. Valentine might be liable as a shareholder succeeding to the liabilities of Johnson, because she has voluntarily assumed that position; but that is no reason why Johnson should not, at the election of creditors, still be treated as a

shareholder, he having, to escape liability, perpetrated a fraud on the statute. This is the view enforced by the decision of the Chief Justice in *Davis* v. *Stevens*, 17 Blatchf. 259.

It is urged that, as the bill prays that Johnson may answer its allegations on oath, the answer is evidence in his favor, and is to be taken as true, unless it is overcome by the testimony of one witness and by corroborating circumstances equivalent to the testimony of another witness. Under the view we have taken of the case, the only material questions which are controverted are the knowledge and intent of Johnson, and the insolvency of Mrs. Valentine, and the knowledge of the latter fact by Johnson at the time. Although Johnson executed the transfer and power of attorney on December 5, he did not deliver it to Mrs. Valentine. He sent it to Lamb for him to act as attorney. Mrs. Valentine had no agency in it. When the transfer had been made on the books of the bank, and the new certificate was made out, it was sent to Johnson on February 14, for him to deliver it to Mrs. Valentine. The letter of that date from Lamb to Johnson, which enclosed it, was full notice to Johnson that the condition of the bank was growing worse. His contract with Mrs. Valentine, if there was one, was not fully consummated on his part till after that. There was no delivery of anything by him to her till after that. On the whole evidence, the intent of Johnson, though denied in the answer, is abundantly proved, because the facts from which the conclusion as to such intent flows are satisfactorily established, to an extent sufficient to satisfy the rule of equity. As to Mrs. Valentine's insolvency, she herself proves it conclusively, and she states facts which show that Johnson must have known it. She could give him nothing, according to her story, to answer for the $4,000 balance due him on the stock, and was reduced to telling him he might consider her jewelry his, for part compensation. Under all these circumstances, the omission of Johnson to testify as a witness for himself, in reply to the evidence against him, is of great weight. This case, on the whole, is brought within the principle asserted by Mr. Chief Justice Marshall, speaking for this court, in *Clark's Executors* v. *Van Riemsdyk*, 9 Cranch, 153, as a case where the evidence arising from circumstances is stronger than the testimony of

any single witness. Greenleaf states, as a rule, that the sufficient evidence to outweigh the force of an answer may consist of one witness, with additional and corroborative circumstances, which circumstances may sometimes be found in the answer itself; or it may consist of circumstances alone, which, in the absence of a positive witness, may be sufficient to outweigh the answer even of a defendant who answers on his own knowledge. Greenleaf on Evidence, vol. iii. sect. 289.

It is contended for the appellees, that this is not a case of equitable cognizance, because a plain, adequate, and complete remedy may be had at law. But the case is one of a transfer of the legal title to the stock, made to defraud the creditors of the bank. The evidence of title to the stock is the formal assignment on the books of the bank. This being a bill for discovery as well as relief, and the fraudulent transfer being good between the parties, and only voidable at the election of the plaintiff, it is clear that equity has jurisdiction to set it aside and enforce the liability of the transferrer.

Objection is taken here, by the appellees, to the sufficiency of the proof that the Comptroller of the Currency decided, before this suit was brought, that it was necessary to enforce the personal liability of the stockholders. The plaintiff, as a witness, testified that he received written instructions from the Comptroller of the Currency to enforce the whole of the personal liability of the stockholders. The defendant Johnson objected that the written evidence referred to must be produced. The record states that the plaintiff reserved the right to file the paper, or a duly certified copy of it, with the deposition, before the same should be closed. Before the deposition was closed the witness was recalled, and produced, as the record states, the original letter, addressed to him and signed by the Comptroller, and it was filed with the deposition. No objection was made to it, and no requirement of further proof was made. It directs the receiver to institute legal proceedings to enforce against every stockholder of the bank owning stock at the time the bank suspended, his or her personal liability, as such stockholder, under the statute. This was sufficient.

The liability of the defendant bears interest from the date of said letter, Aug. 13, 1875. *Casey* v. *Galli*, 94 U. S. 673.

In June, 1878, Orson Adams was appointed receiver of the bank, in place of Bowden, the plaintiff. The decree of the Circuit Court was not made till January, 1879. The appeal to this court was taken in the name of Bowden, Adams not having been substituted as plaintiff. Adams became surety in the appeal bond, and thus treated the decree as valid and adopted the appeal. Adams now moves to be substituted as plaintiff and appellant in place of Bowden, without prejudice to the proceedings heretofore had. The appellees and their counsel first heard of the appointment of Adams from the papers served on the motion for substitution, and the appellees now move to dismiss the appeal, on the ground that none was ever lawfully taken. We think that the motion of Adams should be granted, and that of the appellees denied. Adams prosecuted the appeal in the name of Bowden, who was and is in life, and had a representative capacity. The power of amendment to this extent is authorized by sect. 954 of the Revised Statutes. It is of the same character as that exercised by this court in *Gates* v. *Goodloe*, where a writ of error was sued out by two bankrupts after their discharge in bankruptcy, and this court, on a motion to dismiss the writ, and a counter motion by the assignee in bankruptcy to be substituted as the plaintiff in error, denied the former motion and granted the latter. 101 U. S. 612.

The motion of Adams is granted, and that of the appellees denied. The decree of the Circuit Court will be reversed, with costs, and the cause remanded, with directions to that court to enter a decree in favor of the substituted plaintiff, as receiver, setting aside, as against him, the transfer of the one hundred and thirty shares of stock by Johnson to Mrs. Valentine, and decreeing that Johnson pay to said receiver the sum of $13,000, with interest thereon, at the lawful rate in the State of New Jersey, from Aug. 13, 1875, with costs. It is

*So ordered.*