### SNOW et al. v. HAZLEWOOD et al.

(Circuit Court of Appeals, Fifth Circuit. December 3, 1907. Rehearing Denied February 25, 1908.)

#### No. 1,565.

1. DEEDS—VALIDITY—BURDEN AND SUFFICIENCY OF PROOF.

Complainant, who resided in California, claimed an undivided interest in a tract of land at Beaumont, Tex., on which a large number of producing oil wells had been sunk by purchasers of smaller tracts from the other owners. She executed a power of attorney to a firm of attorneys to establish and represent her interest, to bring suits and settle or compromise the same, under a contract by which they were to have half the proceeds. Pending such suits one of the attorneys negotiated a sale of her interest to a syndicate operating wells on the land, and on his recommendation, she made the conveyance. The attorneys, however, retained their half interest, which fact was not known to her. Within three weeks after the sale, the syndicate transferred a one-half interest in their purchase to such attorney for the same price they had paid, for which they took his note, which transfer was not known to his partners nor to complainant. The transferees of her interest realized therefrom largely more than she received for it. Held, in a suit by complainant against the attorney and the members of the syndicate for a cancellation of her deed and an accounting, that such facts placed the burden upon the defendants to prove the good faith of the transaction, and that there was no secret agreement that the attorney should have an interest in the purchase; and that the evidence was insufficient to sustain such burden.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 16, Deeds, §§ 588, 589, 645.]

2. EQUITY—ANSWERS AS EVIDENCE—PROOF TO OVERCOME.

Sworn answers to interrogatories propounded by a bill in equity, although required by the bill and relating to matters within the personal knowledge of the defendants, may be overcome by circumstances shown, although not positively contradicted by the testimony of any witness.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 715-724.]

Shelby, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

E. C. McLean and W. D. Gordon, for appellants.
Horace Chilton and C. L. Galloway, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. This is a suit brought by the complainant and appellant Mrs. Annie E. Snow to set aside and cancel a deed made by her to W. F. Casey, dated November 6, 1901, and delivered about November 13, 1901, to all her interest and estate in the John A. Veatch survey in Jefferson county, Tex., and for an accounting. The disputed matters involved are so largely questions of fact that it is unnecessary to state the lengthy and somewhat argumentative pleadings, or to set out the evidence further than as hereinafter given.

The case shows that oil had been discovered and developed in large quantities on the Veatch survey in Jefferson county, Tex. Mrs. Snow had a claim to a life estate in one undivided eighteenth of said survey. Hazlewood, Beaty, and Gordon discovered this claim, and, finding Mrs. Snow in California, informed her of her rights and her prospective wealth, and procured from her a power of attorney to promote and prosecute the claim, reserving for themselves a full half interest in the proceeds. Armed with this authority, they instituted an action at law in the proper court to establish Mrs. Snow's legal title, and also brought a suit in equity against all parties producing oil in the territory for an accounting for Mrs. Snow's share of oil produced. This suit, after preliminary hearing and an intimation of favorable action by the judge, was discontinued, and another against fewer parties was brought, and in this suit an application for a receiver was pending, and on November 10, 1901, the application for receiver was favorably acted upon. The claim of Mrs. Snow was a cloud upon all the titles to the oil territory in the Veatch survey, and, if upheld in the courts, it was of enormous speculative value. Even while pending it was a club in the hands of Mrs. Snow's attorneys and promoters to force compromises and settlements. It is a fair inference from the evidence in the case that through compromises and settlements the attorneys of Mrs. Snow expected to get large returns, but up to November 1, 1901, although Hazlewood and Beaty, as they say, had spent most of their time from June 1st in endeavoring to procure settlements, there was no favorable result. The actual value of Mrs. Snow's claim depended, first, on her ability to establish her title against adverse claimants; and, second, upon her lease on life and the continued supply of oil on the Veatch survey. Beaty says he thought it would take a long time to bring substantial results, and had doubts as to complainant's good title. According to Hazlewood, he doubted and feared as to the title, Mrs. Snow's living long enough, and as to the continued flow or supply of oil. Gordon admits that he thought Mrs. Snow's title was good, and would be upheld in the courts. When Mrs. Snow's son, John Allen Veatch, came on, he soon became imbued with the pessimistic views of his mother's claim expressed by Hazlewood, and unquestionably became anxious for his mother to sell out. The Hogg-Swayne Syndicate was a voluntary association of a number of speculators who had acquired title in the Veatch survey to 15 acres on the so-called "Spindle-Top" heights. There were a number of adverse claims, more or less serious, among them the Snow claim. Judge Brooks, a leading member of the syndicate, testifies:

"The Hogg-Swayne Syndicate had previous to November 1, 1901, made a preliminary contract with the representative of the English company for the sale and development of a large portion of their holdings on Spindle-Top, and we had arranged to meet said representative of said English company in New York about the 10th of November, 1901, at which time we were to submit to the attorneys for said representative our abstracts of title to the land under contract, to be passed upon by the attorneys for said English company, and, if same were found to be satisfactory, we were to finally close said contract, and we expected to leave for New York equipped with abstracts of title and the opinion of local attorneys of the English company as to our title to the land under contract. * * * The adverse claims of title to the 15 acres claimed by the Hogg-Swayne Syndicate had not seriously affected the sales by the Hogg-Swayne Syndicate of their property up to November 1, 1901. However, under our contract with the English company for the remainder of said 15 acres, we were to furnish abstracts showing clear title. We procured these abstracts and secured the opinion of local attorneys of the English company as to the Hogg-Swayne Syndicate title, but they were unwilling to state that the abstract showed clear title, because of the pendency of the 'Snow' claim, or a settlement of the same in some way, prior to our attempting to close up the contract with the English company in New York."

The sale of Mrs. Snow's right, title, and interest to the Hogg-Swayne Syndicate was negotiated and carried through by her attorneys, to wit, Messrs. Hazlewood, Gordon & Beaty, who held Mrs. Snow's power of attorney, which authorized them to make all such compromises and settlements concerning the suits to be instituted and prosecuted as to them might seem just, and by her son John Allen Veatch, who was representing his mother under verbal instructions to rely upon and follow the advice of Hazlewood. The sale made was one covering Mrs. Snow's interest, but the attorneys, Hazlewood, Gordon & Beaty, retained their interest. The evidence is that the syndicate declined to buy the attorneys' interest on the terms proposed. Mrs. Snow knew nothing of the negotiations leading up to the sale. She executed and forwarded the deed of her interest on receipt of the following telegrams:

"22 Paid.
"Received at ———.                                             Nov. 5, 1901.
"Dated Beaumont, Tex., Nov. 5, 1901.
"To B. H. Snow.
"Avoid service on mama. Send her Lower Lake immediately until advice from me. Do you approve settlement ten thousand net to you.     Veatch."

"31 Paid     4:16 P. M.                                        11–6–1901.
                                                          "Houston, Tex.
"T. H. Snow.
"Register me immediately yours and mothers deed John A. Veatch headright survey Jefferson County favor W. F. Casey have certificate acknowledgment according Texas statutes continue avoid service until I write you.
                                                 "John Allen Veatch."

These telegrams were written or dictated by Hazlewood. The evidence is conflicting as to whether or not John Allen Veatch, who signed the agreement to sell, actually knew and understood that the proposition was for his mother to sell out her interest while the attorneys retained theirs; but there is no dispute, no claim even, that Mrs. Snow knew, or was in any wise advised by any of her agents and attorneys at the time, that the attorneys were to retain their interest.

while hers was to be sold. Hazlewood for Mrs. Snow and Campbell for the Hogg-Swayne Syndicate negotiated the sale. The agreement to sell was dated November 5, 1901, the deed of Mrs. Snow delivered and the money paid over to her son on November 11, 1901. Within three weeks from the delivery of the deed the Hogg-Swayne Syndicate, the purchaser of Mrs. Snow's interest, transferred to Hazlewood one-half of the interest on and for the same consideration which was paid to Mrs. Snow, and this without her knowledge or the knowledge of any of her attorneys, or the public generally. In the meantime, and thereafter, Hazlewood continued to represent Mrs. Snow in the same and other litigation, obtaining from her deeds, powers of attorney, etc., as the exigencies of the situation seemed to require, sedulously concealing his acquired interest, while assuring his client that her sale was a good one, and otherwise trying to quiet her discontent. Under these circumstances, there are some very good reasons for holding the sale and transfer of Mrs. Snow to the Hogg-Swayne Syndicate as void on the ground of public policy. See White & Tudor's Leading Cases in Eq. (H. & W. Notes) vol. 1, pt. 1 (Ed. of 1876) p. 232, and vol. 2, pt. 4, pp. 1216, 1225. However this may be, the authorities and the reason of the case require the sale to be held prima facie fraudulent and void, thus putting the burden of proof upon the defendants to establish the good faith of Hazlewood in advising and negotiating the sale by Mrs. Snow, and to the extent of showing that the transfer by the Hogg-Swayne Syndicate to Hazlewood was not only subsequent to, but was not contemplated by the parties until after, the sale from Mrs. Snow to the Hogg-Swayne Syndicate had been completed. More especially we may say that the burden is on Hazlewood to show his good faith advising Mrs. Snow of all the facts and circumstances attending and bearing on the transaction likely to affect or persuade her action in selling her interest, and on the Hogg-Swayne Syndicate to show that they dealt with Mrs. Snow's agents at arms' length, without secret agreements of any kind affecting the transaction. To meet this burden, we have the evidence of Hazlewood to his good faith, and that there was no agreement or understanding express or implied that he should be or was interested as a purchaser, and we have the evidence of Campbell that there was no understanding or agreement that Hazlewood should have an interest in the purchase from Mrs. Snow. The evidence of Judge Brooks is:

"The sale to Hazlewood by the syndicate was not made in compliance or furtherance, or in carrying out any previous agreement or understanding with said Hazlewood on my part. I, of course, cannot speak as to other persons, but it was not done in pursuance of any agreement with any other person, or with the Hogg-Swayne Syndicate, so far as I know or have reason to believe."

And the evidence we have of the other members of the syndicate who testified on the subject is to the same purport.

It is significant to note that, while Hazlewood concealed the transaction from his associates, Campbell did not communicate the same to his colleagues until it was an accomplished fact. On the hearing before the master, evidence was offered tending to show the fraudulent

schemes and conduct of Hazlewood in conducting other matters and litigation about the time of, but mainly subsequent to, the Snow purchase. The master rejected the evidence. The court below admitted this evidence, and we find no motion in this court to suppress the same. The admissibility and probative effect of this class of evidence is considered in Wigmore on Evidence, §§ 304, 325, 340, and cases there cited. Its effect here, if considered, goes beyond showing a system or intent, and to the extent of tainting, if not absolutely destroying, Hazlewood's evidence in his own behalf. It is impossible to read the letters and evidence of Hazlewood, and retain any confidence in his good faith and fair dealing with his clients when his own interests are affected. Whether or not Hazlewood had an implied interest in the purchase from his client depends upon the effect to be given the evidence of Campbell, who negotiated the affair for the Hogg-Swayne Syndicate, and Campbell swears positively and unequivocally that Hazlewood had no such interest. Campbell is negatively corroborated by other members of the syndicate; that is to say, they knew of no such understanding, which is probably true as Campbell managed the affair himself. Against him is his interest in the case, and, to some extent, the circumstances. According to Judge Brooks, the syndicate had to have control of, or a release from, the Snow claim to successfully carry through the sale of their remaining properties to the English capitalists. They had been negotiating for a release since October, and it is to be presumed that the syndicate was ready to meet the exactions within reasonable financial bounds of the persons who controlled the Snow claim, and Hazlewood was in control to fix terms. The syndicate claims that it only bought the Snow claim to secure a release therefrom as to its 15 acres. The syndicate emphasizes this position. When the syndicate offered to sell the Snow claim to outside parties, it was always coupled with a release of the 15 acres. When one-half interest in the claim was transferred to Hazlewood, there was no release of the 15 acres, but Hazlewood was put in exactly the same position as if he had been an equal partner with the syndicate in the purchase, and the syndicate practically loaned him the money to pay his part of the purchase. Why? It may be answered that the amount the syndicate was to pay for a release of its holdings from the Snow claim had been agreed upon at the time of the agreement to purchase. November 11, 1901, the day before the delivery of Mrs. Snow's deed, Hazlewood wrote Campbell (letter signed Hazlewood, Beaty, Gordon) that the amount was agreed upon, but not naming the same, and this shows there was a secret agreement with Campbell; and Beaty says that, about November 10th or 11th, "I understood from him [Hazlewood] that this settlement was agreed upon at the time that the Hogg-Swayne people agreed to purchase the Snow interest." It may be remarked that this agreement to compromise with the syndicate was not communicated to Gordon, nor to John Allen Veatch, nor to Mrs. Snow; and it seems that, if there was anything in it, it was a secret agreement or understanding affecting the sale of the Snow interest. The fact is (under the evidence) that the release of the syndi-

cate holdings from the Snow claim was not finally agreed upon by all parties in interest until December 4, 1901, when Hazlewood influenced Beaty and both influenced Gordon, and the settlement was effected, and at this time Hazlewood was confessedly the owner of the one-half of the interest purchased by the syndicate from Mrs. Snow, and this interest was concealed from both Beaty and Gordon. In fact, the concealment continued up to about the time this suit was instituted.

About and before the time this suit was filed, Hazlewood was frequent and persistent in alleging that the sale to him was six months after Mrs. Snow's deed. Campbell told George Greer that it was some time afterward, and he referred to Hazlewood's having gone to Kentucky and returned before it was consummated. Hazlewood says he went to Kentucky some time in March, and returned to Beaumont in April, 1902. Hazlewood in his answer alleges that the sale to him was between the 28th of November and the 3d of December, 1901. Campbell in answer says it was about 20 days after Mrs. Snow's deed. When Hazlewood's private box in the partnership safe was surreptitiously ravished, the note of Hazlewood given for the consideration fell into the hands of complainants' solicitors, and was photographed, and returned with certain photographers' earmarks. This note was dated November 8, 1901, was indorsed on the back without date in the handwriting of Campbell, and signed by Hazlewood as follows:

"It is hereby agreed that the one-fourth interest in the Snow claim, being one-half that of Mrs. Annie Snow purchased by W. T. C. and held in the name of W. F. Casey is security for this obligation."

This note fixes the date of the transfer on November 8, 1901, but Hazlewood and Campbell explain, and in their explanation they are corroborated by Marshall, vice president of the bank where the note was drawn and made payable and then a member of the syndicate, that the note was dated back to the date syndicate put up the money to buy Mrs. Snow's claim to avoid the calculation of about 20 days' interest on the amount thereof. Attacking this explanation, complainant points out that the money for Mrs. Snow's interest was put up November 5th, and that on the 28th of November the Snow interest was not held in the name of W. F. Casey, but in the name of Swayne, the regular trustee of the syndicate. It is thus seen that, while there are strong presumptions that there was an understanding between Campbell and Hazlewood that the latter might acquire an interest in the Snow claim after it should be purchased by the syndicate, there is room for grave doubts as to whether, in fact, Hazlewood did not acquire such interest pending the negotiations and before Mrs. Snow's deed was actually delivered.

There are many other circumstances shown by the evidence, some bearing in favor of the syndicate's contention that the sale of the one-half interest in the Snow claim to Hazlewood was an afterthought, and others tending to show the contrary; but it would unnecessarily air the chicanery and general shortcomings of the wealth hunters of all trades and professions infesting the Texas oil fields when the "boom was on," with which the record teems, if we should review all the

evidence. It was the duty of Hazlewood, Beaty, and Gordon to advise Mrs. Snow of the situation and of all circumstances, propositions, and actions taken bearing on the value of her interest and affecting the desirability of selling the same. Beaty appears to have been aware of this, for he insisted that Mrs. Snow's son, John Allen Veatch, should be informed that the attorneys were going to retain their interest. But informing John Allen Veatch was not enough; for, while he enjoyed his mother's confidence, he had no agency or credentials, save his relationship, while Hazlewood, Beaty, and Gordon had a full power of attorney, authorizing them to compromise and settle in their judgment. As to Hazlewood's agreement with the syndicate fixing the amount to be paid for a release of the syndicate holdings and made before the sale by Mrs. Snow was consummated, there is no pretense that either Mrs. Snow or her son was advised of the same. It was the duty of the Hogg-Swayne Syndicate to deal openly and above board with Mrs. Snow's agents, and to prove in this case that the sale was concluded on their part without secret understandings of any kind. The evidence is that there was a secret understanding between Campbell and Hazlewood as to the price of the release of the Snow claim on the 15 acres of the Hogg-Swayne Syndicate; and whether there was a secret understanding as to the interest to be acquired by Hazlewood in the purchase of the Snow claim rests upon the evidence of Hazlewood and Campbell. Hazlewood's evidence we eliminate. We do not consider that Campbell is corroborated in this particular respect—that is, all that his associates testify may be true, and yet the secret understanding may have existed—and, when we consider the acts and circumstances which speak so much louder than mere words and declarations, we are forced to the conclusion that such understanding did exist, and therefore find that the defendants have not relieved themselves of the burden of proof justly put upon them by the admitted facts in the case.

The contention that Mrs. Snow received full value for her claim is not supported by the evidence and the admitted results. The evidence shows that just after the sale by Mrs. Snow, and before the affirmative decision of the Circuit Court of Appeals was rendered, Withers was offered one-sixth interest and the perspective receivership for $30,000, Underwood was offered one-half interest in the Snow claim with the syndicate holdings released for $25,000, and that, after several compromises had been effected and he had received the proceeds thereof, Beaty sold his one-sixth interest for $10,000, and, further, that within six months in settlements and compromises the parties received on account of Mrs. Snow's interest many times $10,000. That Mrs. Snow's claim was of doubtful right, and would not have been eventually upheld by the courts, the defendants are equitably estopped from asserting in this suit.

In reaching our conclusion, we have not overlooked the sworn answers of Hazlewood and Campbell to the interrogatories of the bill, to the effect that there was no agreement nor understanding between them prior to the sale that Hazlewood was to have any interest whatever in the purchase from Mrs. Snow; nor have we been unmindful

of the general equity rule that, where the defendant on complainant's requirement has answered under oath interrogatories propounded by the plaintiff, the answers are to be taken as true, unless contradicted by two witnesses or one witness supported by strong corroborative circumstances. We find that the answers of Hazlewood and Campbell are not only contradicted by admitted documentary evidence which unexplained is conclusive on the subject-matter of the answers, but by so many facts and circumstances that we may well apply the exception to the above-mentioned equity rule announced in Clark's Executors v. Van Riemsdyk, 9 Cranch, 153, 3 L. Ed. 688, approved in Bowden v. Johnson, 107 U. S. 262, 2 Sup. Ct. 255, 27 L. Ed. 386, where it is said:

"This case, on the whole, is brought within the principle aserted by Mr. Chief Justice Marshall, speaking for this court, in Clark's Executors v. Van Riemsdyk, 9 Cranch, 153, 3 L. Ed. 688, as a case where the evidence arising from circumstances is stronger than the testimony of any single witness. Greenleaf states, as a rule, that the sufficient evidence to outweigh the force of an answer may consist of one witness, with additional and corroborative circumstances, which circumstances may sometimes be found in the answer itself; or it may consist of circumstances alone, which, in the absence of a positive witness, may be sufficient to outweigh the answer even of a defendant who answers on his own knowledge. 3 Greenleaf on Evidence, § 289."

It follows from our conclusions that the decree of the Circuit Court should be reversed, and the complainant given relief canceling the deed to Casey of November, 1901, the power of attorney to Hazlewood of date November 25, 1901, and the deed executed thereunder June 18, 1902, to Campbell and Swayne, trustees, and recorded in Jefferson county, Tex. (vol. 65, pp. 62–64), except so far as the rights of innocent purchasers are concerned, and ordering an accounting of all sales and releases and settlements made by the defendants based on complainant's rights in the Veatch survey; and, on such accounting, that the complainant should have such relief against the several defendants as equity and good conscience may require, all conditioned upon the complainant's paying into the court for the benefit of the Hogg-Swayne Syndicate the $10,000 as tendered in the twenty-fourth paragraph of the bill.

The decree of the Circuit Court is reversed, and the cause is remanded, with instructions to enter a decree in favor of complainant as above indicated, and otherwise proceed in accordance with the views herein expressed and as equity may require.

SHELBY, Circuit Judge (dissenting). The view I take of this case requires me to dissent from the opinion and decree of the court.

The suit is brought by Mrs. Annie E. Snow against R. R. Hazlewood, who had been her attorney, and J. S. Hogg, James W. Swayne, R. E. Brooks, R. Oliver, E. J. Marshall, and W. T. Campbell, individually and as members of an alleged copartnership known as the "Hogg-Swayne Syndicate," and W. F. Casey.

The bill alleges the fraud and bad faith of Hazlewood as the agent and attorney of the complainant, and a conspiracy of the Hogg-Swayne Syndicate with him to obtain at a nominal price certain valuable property of the complainant. It calls for sworn answers. The defendants answer under oath, denying the fraud and the conspiracy. Pursuant to a

written agreement of the parties, the court appointed a special master in chancery, W. S. Moore, Esq., to hear the testimony, and, after hearing the evidence and argument of counsel, to report his conclusions of fact and of law on all the issues presented. The special master, after hearing the case, made a report showing a careful consideration of the evidence, exonerating Hazlewood from the charge of fraud and bad faith as an attorney, and also clearing him and the members of the Hogg-Swayne Syndicate of the charge of conspiracy to defraud the complainant. The complainant filed exceptions to this report. The learned trial judge, after considering the report and the evidence on which it was based and some evidence which the special master had rejected, confirmed the report in holding Hazlewood guiltless of the grave fraud charged against him, and holding him and the Hogg-Swayne Syndicate guiltless of the conspiracy charged against them. The case comes to this court on appeal by the complainant, who assigns that the court erred in the decree confirming the report of the special master.

The pleadings present this question: Did Hazlewood, while complainant's attorney, deceive and mislead his client, thereby inducing her to sell her interest in the Veatch survey to the Hogg-Swayne Syndicate for greatly less than its value, having conspired with the syndicate, or a member thereof, to so induce and deceive her, with agreement between the conspirators that Hazlewood was to have an interest in the purchase by the syndicate?

If there was no conspiracy between Hazlewood and the other defendants, and if when Hazlewood advised the sale of the Snow interest to the Hogg-Swayne Syndicate he did so in good faith and there was no agreement that he was to take an interest in the purchase, then the bill was properly dismissed. How does the case stand as to these issues? The charge of the fraud and the conspiracy is made in the bill, and sworn answers are called for. The complainant, under the forty-first equity rule, could have waived answers under oath, but she did not pursue that course. On the contrary, Hazlewood and Campbell were required to answer the material averments of the bill under oath, and also to answer two interrogatories relating to the charges of fraud, bad faith, and conspiracy. All the other defendants are also required to answer the material parts of the bill under oath. The sworn answers deny the charges clearly and with emphasis. The rule in such cases is plain. When the bill calls for answers under oath, and it is answered accordingly, the matters inquired about being within the personal knowledge of the respondent, the denials of the answer must be overcome by the evidence of two witnesses, or by one witness corroborated by circumstances which are equivalent in weight to another witness. This rule is as well established as any rule applicable to the trial of cases in equity. Morrison v. Durr, 122 U. S. 518, 7 Sup. Ct. 1215, 30 L. Ed. 1225; Vigel v. Hopp, 104 U. S. 441, 26 L. Ed. 765. In Codden v. Kimmell, 99 U. S. 201, 206, 25 L. Ed. 431, this rule is applied in a case where the bill attacked an assignment for fraud; and in Gilman v. Libbey, 4 Cliff. 447, Fed. Cas. No. 5,445, Mr. Justice Clifford applied the rule in a case in which the complain-

ant, who had been the client of the defendant, an attorney at law, brought suit against him alleging fraudulent conduct on his part as her attorney. It was a suit to recover property that it was alleged he had obtained partly by his fraudulent conduct as attorney. The court held that, in such case, "where the answer is responsive to the bill of complaint, and positively denies the matter charged, and the denial was in respect to a transaction within the knowledge of the respondent, the answer is evidence in his favor, and, unless it is overcome by the satisfactory testimony of two opposing witnesses, or of one witness, corroborated by other facts and circumstances, which give to it greater weight than the answer of the respondent, it is conclusive, so that the court will neither make a decree nor send the case to trial, but will simply dismiss the bill of complaint." But, as the majority "eliminates" Hazlewood's evidence, it may be that the answers of Hazlewood and Campbell are also ignored. But this is not permitted. In Brown v. Bulkley, 14 N. J. Eq. 294, the complainant sought to avoid the rule in question by impeaching the defendants, who had answered denying the allegations of the bill. The court held:

"The rule has been perfectly established for two centuries that the direct and positive answer of the defendant, responsive to the charges of the bill, must prevail unless overcome by two witnesses, or by one witness supported by circumstances, or by equivalent evidence. The admission of extrinsic evidence to discredit the answer by impeaching the credibility of the defendant is a subversion of the principle of the rule."

The record does not disclose two witnesses, nor one witness testifying to the truth of the allegations of the bill on the crucial points— the averment of the conspiracy, and the averment of Hazlewood's fraudulent betrayal of his client. On the contrary, the two witnesses who must know the real facts, Hazlewood and Campbell, testify in accordance with the denials of their answers, and they are sustained by Marshall, Brooks, and others as to collateral circumstances bearing on the main issues. The opinion of the court sustains the averments of the bill, contrary to the established rule above quoted, by collating circumstances of suspicion found in the record. These circumstances seem to me satisfactorily explained by the defendants, but, if they are not explained, they are not sufficient to authorize the granting of relief to the complainant. In Morrison v. Durr, supra, the court applied this rule, although it was said the record was "full of circumstances calculated to excite suspicion." In Bowden v. Johnson, 107 U. S. 251, 262, 2 Sup. Ct. 246, 27 L. Ed. 386, cited in the opinion of the majority, the sworn answer was overcome by the evidence of one witness, Mrs. Valentine, who was corroborated by circumstances. In Clark's Executors v. Van Riemsdyk, 9 Cranch, 153, 3 L. Ed. 688, where it was held that the answer may be outweighed by circumstances, the answer related to a fact "which in the nature of things cannot be within the personal knowledge of the defendant." The circumstances which militate against the answers of the defendants in this case are collected in the opinion. They are not sufficient, in my judgment, even if unexplained, to bring the case within any exception to the rule. 1 Ency. Pldg. & Prac. 932, § 6, notes 1, 3.

There is another well-settled rule that would lead to the affirmance

of the decree. The case was referred by the court to the special master to report, not only the evidence, but the facts of the case and his conclusions thereon. The master's finding is attended by a presumption of correctness, not absolutely conclusive; "but, so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable." Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 39 L. Ed. 289. The case for the appellees is, I think, stronger than the rule requires, for the master's finding is sustained by the weight of the evidence. On the turning point in the case it can only be successfully attacked by deciding against the credibility of witnesses who were evidently believed to be speaking the truth by the special master and the learned judge of the trial court.

There is another feature in the case that gives greater weight to the master's report. The order of reference was made by written agreement of the parties. It was held in Kimberly v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 32 L. Ed. 764, that a reference by consent of parties of an entire cause for the determination of all the issues, though not strictly a submission of the controversy to arbitration, is a submission of the controversy to a tribunal of the parties' own selection, and the findings should not be disturbed unless clearly in conflict with the weight of the evidence on which they were made.

The proper application of these familiar rules in my opinion would require an affirmance of the decree of the Circuit Court.

But, if the foregoing rules are disregarded, I reach the same conclusion from an examination of the record.

It is true, of course, that Hazlewood could not, while acting as Mrs. Snow's attorney to sell the property, become interested in its purchase. If he bought under such circumstances, he would hold the property in trust for her, and the purchase, so far as he was concerned, would not be valid unless she ratified it. But, after she had sold her interest and executed a transfer and he had ceased to be her agent as to the property sold, there is no good reason why he could not buy an interest in it from her vendees. After she had sold her interest, his right to buy is well settled. Robertson v. Chapman, 152 U. S. 673, 682, 14 Sup. Ct. 741, 38 L. Ed. 592; Walker v. Carrington, 74 Ill. 446; McGar v. Adams, 65 Ala. 106.

The case turns on the question whether or not, before or at the time of Mrs. Snow's sale, it was agreed between Hazlewood and Campbell, the latter acting for the Hogg-Swayne Syndicate, that Hazlewood was to have an interest in the property transferred by Mrs. Snow. The weight of the evidence, in my opinion, sustains the defendants' sworn answers that there was no such agreement. Both Hazlewood and Campbell so testify. Brooks, whose relations to the syndicate were such that an agreement of this kind would probably not have been made without his knowledge, testifies that he had no knowledge of such an agreement. Moreover, it is shown that no member of the syndicate knew of it. There is nothing to indicate that Campbell would have felt authorized to make agreements with Hazlewood as to the sale of property without the knowledge of Brooks or of other members of the syndicate. On the contrary, when it came to closing the pur-

chase of the Snow interest, including also the half interest of Hazlewood, Gordon, and Beaty, Judge Brooks declined to take the attorneys' half. He was evidently in control at that point. Are we to believe that Campbell would have ventured to make an agreement to let Hazlewood have one-half interest in the purchase from Mrs. Snow without consulting Brooks, Hogg, Swayne, or any other member of the syndicate? It seems to me clear that, if the conspiracy existed, it was not confined to Hazlewood and Campbell. The complainant, however, tries to avoid the burden of fastening the grave charges on Hogg, Brooks, and others. Campbell is selected, being less conspicuous, as the vicarious victim. It is not reasonable, however, that Campbell would have acted without informing others of the syndicate, and the fact that the others deny all knowledge of the alleged fraud is a strong circumstance in favor of the truth of the answers of Hazlewood and Campbell.

The evidence convinces me that, under all the circumstances that surrounded the litigation in which Mrs. Snow was engaged, the sale of her interest for $10,000 was not unwise, and that the price at that time was fair. The charge in the bill that Hazlewood fraudulently induced her to make a sale for an inadequate price is not sustained by the evidence. The fact that Beaty, Gordon, and Hazlewood offered to sell on exactly the same terms on which the latter advised Mrs. Snow to sell is a circumstance, almost, if not entirely, conclusive, to show that, as things then appeared, $10,000 was a fair price for her interest. The attorneys would have sold at the same price if Judge Brooks had not declined to have the syndicate buy their interests. They all three offered to do what Hazlewood advised her to do. The weight of the evidence of other witnesses, moreover, is to the effect that the price was, under the circumstances, fair and adequate. If the bubble of speculation and inflated prices had burst a little sooner than it did, she would have plumed herself on her wisdom in selling, and the attorneys would have regretted their failure to sell on the same terms. Events occurred that increased the value of the property she had sold, and great stress is laid on the increased value to show that she was induced to sell at an unfair price. That is a circumstance that appears in every case where a rescission and cancellation of deeds is sought and a tender of purchase money is made, because if the property, at the time of the suit, was not worth more than the amount paid for it, there would be no reason for suing. That Hazlewood advised her in good faith is shown by the further fact that Beaty, a lawyer well informed as to the facts and who had a one-sixth interest in complainant's claim, frequently offered to sell his interest on the same terms that Mrs. Snow sold hers. Hazlewood could have bought Beaty's interest at the time he advised the sale of Mrs. Snow's, or at the time he purchased an interest from the syndicate. I cannot believe that he would have conspired with Campbell to cheat his client and obtain an interest in the property when he could have obtained nearly the same result by a purchase of Beaty's share.

Mrs. Snow's son, John Allen Veatch, was on the ground and took part in the negotiations leading to the sale of his mother's interest. He appears to be fully competent to understand the business connected

with the sale. He was a mining engineer, 34 years of age, and, according to his own statement, received an annual salary of $20,000. He approved of the sale, and thought the price fair at the time it was made.

The complainant seeks to overcome these convincing circumstances by asserting that Hazlewood deceived not only his client, who was in California, but the lawyers Gordon and Beaty, and the mining engineer, Veatch, who were on the ground and had every opportunity to know the market value of the property. The special master and the Circuit Court ruled correctly, I think, in refusing to indorse such a theory.

I do not concur in the view that the burden of proof is on the defendants. A conspiracy being charged in the bill and denied in the answers, the burden is on the complainant to prove it. Hazlewood being charged with betraying and deceiving his client, and having denied it, the burden is on the complainant to prove the charge. Cochran v. Blout, 161 U. S. 350, 16 Sup. Ct. 454, 40 L. Ed. 729. Moreover, the evidence, where fraud is charged, must be so clear and cogent as to satisfy the triors of the issue of the truth of the allegation. The law is reluctant to impute fraud and unfair dealing on slight and conflicting evidence, and thereby cast an unjust reproach of a grave nature on the character of the defendants. Bump on Fraudulent Conveyances, 562.

I concur in the view that, it appearing that Hazlewood acquired an interest shortly after the termination of his agency, it is incumbent on him to show affirmatively that there was no agreement at the time of the sale by the principal that he was to have an interest in the purchase. He does this in the only way that it could be done, by his own testimony, giving in detail the facts that led to his purchase several weeks after Mrs. Snow's sale, and by the testimony of Campbell, who acted for the Hogg-Swayne Syndicate in making the sale to Hazlewood, and by Marshall, who was present when Hazlewood's note was given and who made the suggestion as to dating it back to November 8th, so that it would bear interest from that time; and Marshall's evidence also indicates that he was a witness to the transfer made to Hazlewood, which does not appear in evidence and will be referred to later. All three of these witnesses testify to circumstances which enable them to fix the date when Hazlewood acquired the interest, and that it was about the last of November or the first of December. This evidence, I think, fully shows that Hazlewood acquired the interest in question after the termination of his agency. The evidence showing that there was no previous agreement that he was to have such an interest has already been mentioned.

Mrs. Snow's deed conveying her interest to a trustee for the syndicate is dated November 6, 1901. She alleges in her bill that before or at that time it was understood between Hazlewood and the other defendants that the former was to have a one-half interest in the purchase from her. Hazlewood claims that he obtained his interest afterwards, between November 28 and December 4, 1901. Great stress is laid on the date of a note offered in evidence as tending to sustain the averments of the bill. Here is the photographic copy of the note:

... agreed that
... interest
... being
... of this Pain...
... A.J.C
... the name
... security,
... ...

$1892.67$

Check 16665
H.S.    250.00
        416.65    N.J.C

Oct 5/02  Paid (Pro.O.Co)  #416.70
March 5/02   "   (Kau)      125.00
Aug 1/02     "   Aug.O.Co.  333.35

On the back of the note is the following indorsement, without date:

"It is hereby agreed that the one-fourth interest in the Snow claim, being one-half of that of Mrs. Annie Snow purchased by W. T. C. and held in the name of W. F. Casey is security for this obligation.

"R. R. Hazlewood."

Just below this indorsement are several credits, beginning December 4, 1901. This photograph was taken by a photographer in New Orleans, who received the note from E. C. McLean, one of the appellant's attorneys. The record shows, without substantial conflict, the manner in which the original note was obtained by McLean. While Gordon and Hazlewood were partners in the practice of law at Beaumont, Tex., they bought an iron safe for use in their office. It had an outside door with a combination lock and two inside steel doors that locked with keys. Gordon had the combination to the safe, but each carried a key to the inner doors. Inside were wooden boxes, each having two keys. One of these boxes was used by Gordon and one by Hazlewood for keeping their private papers. Gordon kept both keys to the box in which he kept his private papers, and Hazlewood kept both keys to the box in which he kept his private papers. Hazlewood had in his private box, among other papers, the paid note which he had made to Campbell when he bought the interest in the Snow claim. He testifies that he also had in the box a written transfer made by Campbell at the same time the note was given, which written transfer bore its true date. When Hazlewood was served with subpœna in this case, he went to the safe to get these papers. The outer door of the safe had been opened in the morning, and, on trying to unlock his private box, he found something wrong with it, but he finally opened it. He saw marks on the edge of the box indicating that it had been forced open with a chisel. He found in the box other papers which he kept there, but the note he made to Campbell and the transfer which Campbell made to him were both gone. He then called witnesses to see the condition of the box. W. D. Gordon, who testifies for the complainant, says, in substance, that he and McLean concluded that Campbell had advanced the money to Hazlewood for a portion of the purchase by the Hogg-Swayne Syndicate from Mrs. Snow, and that evidence to sustain this theory existed in Hazlewood's box in the safe. By taking out the box immediately above Hazlewood's box, he (Gordon) and McLean were able to raise the lid over Hazlewood's box and get access to his papers. In that way they obtained the original note, and McLean carried it to New Orleans, where it was photographed. It was then returned to the box.

The note is dated two days after the date of Mrs. Snow's deed, but it is so near its date as to give some support (if it bears its true date) to the theory that Hazlewood had an interest in the purchase when made. If the transfer had been produced, it would probably have made it clear when Hazlewood acquired an interest. Hazlewood says it was in the box with the note. There is conflict between his statement and Gordon's on this point. Both Hazlewood and Campbell, as has already been said, testify that the former's purchase of an interest in the Snow claim occurred between November 28 and Decem-

ber 4, 1901—and they give reasons for so fixing the date—and that the note was dated back to November 8th to make it bear interest from that date. Marshall, a witness with little, if any, interest in the suit, corroborates this statement. The special master evidently believed them; and I see no good reason to doubt the truth of their statements. The transfer, if it could have been produced, would have cleared up the difficulty. Hazlewood, Campbell, and Marshall testify, in effect, that there was such an instrument, and that it bore the true date. Hazlewood says it was in his box. It is altogether probable that he would have kept it in the box with the note. Evidence was offered of declarations by McLean tending to show that he claimed to have in his possession a transfer from Campbell, the existence of which he thought Campbell would deny. The complainant did not examine McLean as a witness. When Hazlewood's "private box was surreptitiously ravished"—to quote the opinion of the majority in this case—in the unlawful hunt for evidence to convict him of fraud, if the transfer with the true date had been found, would it have been photographed also? Would it have been offered in evidence? Would not the motive that made the searchers disregard the sanctity of private papers have been strong enough to make them produce and use only those that tended to sustain the theory they sought to establish? The motive that caused this invasion of Hazlewood's private box must have been strong to have made lawyers violate a right instinctively respected by gentlemen and held so sacred in this country that it has been the subject of constitutional protection—the right to hold one's papers secure against unreasonable and unlawful searches and seizures. When a motive exists that leads to such a method of obtaining evidence, we should scan with suspicious scrutiny all the evidence coming from the same source.

In my opinion, the evidence shows that a transfer was made, bearing date the latter part of November or the 1st of December, 1901, and that the note was dated back to make the interest run from November 8th, as explained by Hazlewood, Campbell, and Marshall.

I think the decree of the Circuit Court confirming the report of the special master should be affirmed.